**Dony M. SUTTLES, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, Marvin T. Runyon, Postmaster, Defendants.**

Civil Action No. H–94–3565.

United States District Court, S.D. Texas, Houston Division.

May 15, 1996.

Dony M. Suttles, Houston, TX, pro se.

Michelle Zingaro, United States Attorney's Office, Houston, TX, for defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

### I. Introduction

Pending before the court is the Motion for Summary Judgment (# 26) filed by Defen- dants United States Postal Service ("Postal Service") and Marvin Runyon ("Runyon") in his capacity as Postmaster General. The defendants seeks summary judgment on all of Plaintiff Dony M. Suttles' ("Suttles") claims.

Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the defendants' motion should be grant- ed.

### II. Background

Suttles began working for the Postal Ser- vice as a letter carrier on July 9, 1983, at the Grandville Alder station in Houston, Texas. His duties as a letter carrier were to case, sort, and deliver mail. Casing is the term for sorting the mail by address prior to bun- dling and delivering it. Casing entails in- serting the mail into slots with the appropri- ate street address. According to Suttles' amended complaint, the cases were six feet high and had at least six hundred slots.

Over the course of his employment with the Postal Service, Suttles alleges that he developed a serious case of Airways Disease ("asthma"). Suttles claims that it was caused by his constant exposure to excessive dust in the cases, vehicle fumes, and smoke. In 1984, Suttles was hospitalized with asthma for five to seven days. Suttles' doctor re- leased him to return to work with no restric- tions and placed him on daily medication. Subsequently, Suttles went to another doctor at the McGovern Allergy Clinic and was test- ed for allergies. It was discovered that Sut- tles was allergic to airborne dust, pollen, and numerous other substances. After Suttles returned to work, he continued to have asth- ma attacks as a result of his exposure to dusty mail cases and letters as well as pollen. The attacks often required him to visit the emergency room once a week.

His condition continued to worsen, and in 1985, Suttles alleges that his doctor suggest- ed to him that a change in climate might improve his condition. Suttles, therefore, re- quested a voluntary transfer to work in Chat- tanooga, Tennessee. The transfer enabled

him to live in Dalton, Georgia, and to attend to his mother who was in a rest home there. As a condition of his transfer, Suttles was required to relinquish his seniority and cover all moving expenses. Suttles transferred in October 1985. After his relocation, Suttles continued to work as a letter carrier and maintained daily asthma medication. In January 1986, however, Suttles was hospitalized for eight days with severe asthma. Because his treating physician told him that the climate in Houston was of better quality than in Chattanooga, Suttles requested a voluntary transfer back to Houston. The transfer was effective January 17, 1987. Suttles again was required to relinquish his seniority.

Suttles was assigned to the Eastwood station as a letter carrier. His letter carrier duties remained unchanged. On average, Suttles would case mail for five hours and deliver mail for five or more hours each day. Suttles' health, however, did not improve. In April 1987, Suttles was placed in intensive care and hospitalized for a week with life-threatening asthma, at which time he met his current physician, Dr. Cartrell J. Cross ("Dr. Cross"). Upon the completion of his hospitalization, Dr. Cross released Suttles to return to work and prescribed a standard regimen of medication. Although Suttles told Dr. Cross that he worked around dust, Dr. Cross did not advise Suttles to wear a dust mask at that time.

Suttles continued to have health problems. He did not have a personal physician and did not see Dr. Cross on a regular basis. Instead, when Suttles became ill, he went to various clinics, the emergency room, or tried to wait through an attack until it had passed. Suttles was hospitalized for asthma twice in 1988, once in 1989, and made three to five visits to the emergency room each year. At the time, Suttles was not aware that exposure to dust aggravated his asthma, and he continued to go outside and do his job.

In May 1990, Suttles was hospitalized for five to seven days and was treated by Dr. Jacques Goldberg ("Dr. Goldberg"). Dr. Goldberg had previously attended to Suttles on prior visits to the emergency room. Dr. Goldberg released Suttles from the hospital without restrictions with the knowledge that

Suttles worked at the post office as a letter carrier. After Suttles' May hospitalization, Dr. Goldberg administered an allergy test which determined that Suttles was allergic to dust, pollen, perfumes, soap, cooking odors, smoke, gasoline, etc. Suttles' allergies were found to be affected when it rained due to an increase in mold spores to which he was allergic.

Suttles returned to the emergency room on June 18, 1990, and was treated by the doctor on call. On July 2, 1990, while out delivering mail, Suttles began having trouble breathing. He returned to the station and the station manager, Mike Guerrero ("Guerrero"), and his supervisor, Shawn Herrera ("Herrera"), drove him to the emergency room. Suttles was rushed to intensive care and intubated due to respiratory arrest. Suttles was diagnosed with status asthmaticus/respiratory failure. He was released from the hospital eleven days later, four of which he spent in intensive care. Suttles remained off work for approximately one month.

Prior to returning to work, Suttles visited the Eastwood station on August 3, 1990, and submitted a Form 13 to Guerrero, requesting reassignment away from letter carrier duties. According to Suttles, a "Form 13" is the standard procedure used by an employee to reach the union or attempt to obtain some type of redress for a problem. Suttles requested an inside job away from the letter cases. According to Suttles, Guerrero told him that he would call once he found something. Suttles claims that he remained off work an additional three weeks because Guerrero ignored his request and did not take any action.

Suttles returned to the Eastwood station with a work restriction from Dr. Goldberg. On September 7, 1990, Suttles provided Guerrero a copy of this restriction which stated that Suttles needed more ventilation in the vehicle and recommended he supply his own transportation. The restriction further provided that Suttles should not be outdoors more than four and a half hours a day. Guerrero allowed Suttles to use his own pickup truck on the route. The truck, however, was not as well suited for the route as the

jeep the post office provided. The pick-up truck was difficult to park, and there was a security problem with the mail because all of it did not fit in the cab of the truck.

While at the Eastwood station, Suttles was not ordered to work outside more than four and a half hours a day. Because the average time on the street for any mail route is five to six and a half hours, Suttles cased another route in order to compensate for the time he was not on the street. The restriction from Dr. Goldberg did not mention staying away from dust or wearing a dust mask. Suttles, however, wore a dust mask while he did the casing, sometimes four masks at a time, which improved the situation. The masks did not provide protection from fumes, detergents, and colognes, however, samples of which mail carriers handle daily. Suttles received weekly injections and occasionally took Prednisone for minor flare-ups, but he was not hospitalized or visit the emergency room. Because Suttles had lost seniority when he voluntarily transferred to Chattanooga and again back to Houston, he was categorized as a "part-time flexible" employee and only guaranteed four hours of work a day. In May 1991, Suttles became a regular, as opposed to a part-time flexible, employee.

Suttles bid to a route at the Roy Royall station on June 1, 1990. At the Roy Royall station, Suttles' route initially was a park and loop route—the carrier parks the truck at specific points and walks the route. Later, the entire station changed to mounted routes—the carrier delivers mail from the jeep unless he has accountable mail requiring a signature. Linda Robertson ("Robertson") was the station manager when Suttles transferred. It is disputed whether Suttles informed his new supervisors at the Roy Royall station of his four and a half hour outdoor restriction. Although Suttles claims he gave his new supervisors a copy of his medical file, Robertson contends that he did not. Suttles alleges that he filed a Form 13 and requested to see an EEO counselor to obtain a dust mask. Before he was interviewed by an EEO counselor, Robertson provided Suttles with a mask, and he dismissed his "EEO" claim. Suttles contends, however, that the masks provided were "in violation of

OSHA and inadequate for the exposures plaintiff incurred."

On October 27, 1990, Suttles applied for disability retirement. Suttles' application ultimately was denied. In November 1990, Suttles filed for federal workers' compensation, claiming that he suffered from asthma and allergic rhinitis as a result of exposure to irritants in the workplace. Suttles received workers' compensation for several months because the Office of Workers Compensation ("OWCP") found that employment factors aggravated his physical condition. As reflected, however, in a OWCP memorandum by Carolyn Dempsey ("Dempsey"), a Senior Claims Examiner, to the Director of the OWCP, dated April 27, 1992, the physician who examined Suttles for the OWCP on December 20, 1991, Dr. Ernest Bartimo, found that the aggravation had been ameliorated by the use of bronchodilators and a dust mask, and there were no permanent residual effects. Dempsey concluded her memorandum by recommending that "a Compensation Order, Rejection of Claim, be entered for the reason that the medical evidence establishes that the work-related aggravation of the claimant's asthma has ceased no later than December 20, 1991."

By decision dated May 14, 1993, the Hearing Representative, Jacquelyn E. Herron ("Herron"), concluded that although the OWCP had correctly determined that Suttles was no longer disabled, it had insufficient medical evidence upon which to terminate medical benefits. Herron directed the OWCP to obtain an opinion from Dr. Cross, Suttles' treating physician, as to the extent and duration of his aggravation and whether it had ceased as of December 20, 1991. On July 29, 1993, the OWCP sent a letter to Dr. Cross requesting his medical opinion, but never received a response. The OWCP therefore obtained an opinion from Dr. Robert Ross ("Dr. Ross"). After Dr. Ross examined Suttles, he issued a report on December 2, 1993, outlining Suttles' medical history. Dr. Ross noted that Suttles developed wheezing and rhinitis compatible with asthma when he was in the service in 1972 and 1973, where, as a receiving clerk at the commissary, he had to do inventory at a warehouse

and was exposed to dust. He was treated with Minarax, a bronchodilator, and discharged in December 1973. Dr. Ross' report also stated that Suttles had no further problems with rhinitis or asthma until he started working for the post office in 1983. Although during his tenure with the Postal Service he had repeated hospitalizations and emergency room visits, Dr. Ross noted in his report that Suttles had none since he stopped work on June 5, 1992. Dr. Ross further reported that "[t]he patient states that he gets significantly worse in his work environment." By letter on January 4, 1994, the Department of Labor notified Suttles that it had not been able to obtain a medical opinion from Dr. Cross and requested that he ask Dr. Cross to provide a medical report. Subsequently, on January 10, 1994, Dr. Cross issued a report stating that "the patient will not be able to work at his previous occupation because of dust allergens, fumes, or smoke." Dr. Cross further noted that Suttles had severe reactive airways disease that is exacerbated when he is exposed to smoke or dusty environments or develops respiratory infections. Dr. Cross explained in his report that medications alone could not control his condition and that "[p]aramount to effective therapy of the patient's condition will be avoidance of irritating environments."

While the final outcome of Suttles' workers compensation claim is somewhat unclear, it appears that his disability claim was denied. Suttles sent letters complaining about the Department of Labor Workers' Compensation Program to Marvin Zindler ("Zindler"), a representative of Eyewitness News/KTRK–TV Channel 13, and his Congressman, Gene Green ("Congressman Green"). In response to Zindler's inquiry, Phillip A. Pelch ("Pelch"), a Human Resource Manager with the Postal Service, wrote Suttles and explained that all decisions on the adjudication of his claim were handled by the Office of Workers' Compensation. Pelch informed Suttles in the letter that the Postal Service's Injury Compensation Office had no power to change or interfere with those decisions. Congressman Green also made inquiries on Suttles' behalf. The Regional Director of the OWCP, Thomas O. Bouis, responded to Congressman Green's inquiry by letter dated December 5, 1995. The letter stated, in part, that to date, Suttles had not specified what appeal he desired.

On February 4, 1992, Suttles submitted to Robertson a handwritten application, Form 991, for the position of business service representative. Robertson allegedly returned the application to Suttles and told him that the application needed to be typed. The next day, before he had been able to type the application, Suttles' mother died out of state. According to Suttles, prior to leaving for the funeral services on February 5, 1992, he submitted the handwritten form to the Acting Station Superintendent, Jocelyn Winn ("Winn"), who allegedly accepted it. Winn did not send the form to headquarters downtown, however, because she felt that a handwritten form was inappropriate. After Suttles returned from his mother's funeral on February 19, it was too late to submit the application. Therefore, Suttles was not one of the fifty-three applicants considered for the position. Suttles contends that he "filed an EEO on this matter."

On March 24, 1992, Suttles filed his first charge with the Equal Employment Opportunity Commission ("EEOC"), claiming handicap discrimination and reprisal. Suttles alleged two violations of the collective bargaining agreement, one regarding a request for reassignment, and the other regarding the alleged refusal to provide a safe work area. Suttles also asserted that he was denied the opportunity to apply for a job as a business center representative when his handwritten application was not processed. The agency accepted for investigation Suttles' allegation regarding the failure to process his application; however, it rejected the allegations regarding the collective bargaining agreement because Suttles had not brought them to the attention of an EEOC counselor prior to filing a formal charge. Suttles did not appeal the rejection of the breach of contract allegations and did not request a hearing on the remaining allegation. On December 23, 1992, the agency issued a Final Agency Decision ("FAD") finding no discrimination. The EEOC affirmed the finding of no discrimination on September 17, 1993, and Suttles' request for

reconsideration was denied on September 9, 1994.

Suttles alleges in his amended complaint that "[a]fter he filed the EEO management began to verbally harass him and continued to fail to abide by the duty restrictions." Suttles contends that his emotional state began to deteriorate because of the constant harassment and management's resistance in helping him secure a safe working environment. Suttles claims that he sought assistance in obtaining counseling from Winn and Robertson, and he contacted the business agent for the National Association of Letter Carriers in regard to counseling, reassignment, and help with his workers' compensation claim. According to Suttles, he received no response from any of the individuals contacted.

On April 3, 1992, Suttles received an updated work restriction from Dr. Goldberg. Suttles was not to work outside because of pollen; was to work in a well-ventilated area, and was not to be exposed to dust and molds. Consequently, Suttles was permitted to work inside all day, casing instead of carrying mail. Suttles worked inside only one day. According to Suttles, the dust mask was ineffective because he was handling "advos" (advertisements) which contained ink to which he was allergic and the mask got in the way. Subsequently, Suttles brought to his supervisors an undated document from Dr. Goldberg permitting Suttles to be outside for four and a half hours per day. It was Suttles' belief that the April 1992 restriction did not negate the prior restriction allowing him to be outside for four and a half hours.

On May 11, 1992, Suttles went to the Employee Benefits Office to resign. Suttles alleges in his complaint that he "went to employee benefits office to resign because he was still in the same work environment that potentially killed him and no one was assisting him in a reassignment." An EEO counselor, Mr. Richardson, persuaded him not to resign and took Suttles to the Employee Assistance Program. Suttles was counseled by Ms. Dobson, who referred him to a psychiatrist, Dr. Fritzpatrick. According to Suttles, he met with Dr. Fritzpatrick on May 15, 1992, who recommended that a change of employment might be necessary if the post office would not reassign him or would not make reasonable accommodation for his condition.

In June 1992, the Roy Royall station realigned postal routes and fewer carriers were needed to handle the new routes. On June 4, Suttles received a form letter from Robertson stating that he was being "excessed"— employer initiated reassignment. Eight other carriers also were excessed at the time. The letter informed Suttles that he could bid out to another station or be transferred to a station the post office selected. On June 5, 1992, Suttles resigned.

On July 17, 1992, Suttles filed a second charge of discrimination with the EEOC, alleging discrimination because of handicap and reprisal. Suttles claimed that he was forced to resign because the Postal Service refused to accommodate him. A hearing was held on March 2, 1994. Subsequently, the Administrative Judge issued a Recommended Decision of no discrimination on September 28, 1994. The agency adopted the findings in its FAD of November 7, 1994. Suttles initiated this action, *pro se,* on October 19, 1994.

Subsequently, Suttles filed an amended complaint, alleging in the introduction:

This is an action based on handicap discrimination (asthma) and reprisal (prior eeo activity), constructive discharge without cause, pursuant to the civil rights act of 1991, pub. L. n. 102–166 sec. 114, amending title VII, sec. 717(c), 42 USC sec. 2000e–16(c), civil rights act of 1964, sec 701 et. seq., 706(e), as amended 42 USCA sec. 2000e et. seq., sec 5(f)(1), executive order 11478; The rehabilitation act of 1973, 29 USC sec. 791, 794 et. seq., 29 CFR sec 1613 et seq. and 1614 et. seq.; Fed.R. civ. P. (15), (18)(a)(b); The labor management relations act, 29 USCA sec 185(c); The postal reorganization act 39 USCA sec. 1208 and 1209 et. seq.; 28 USCA 1331, 1339, and 1343 et. seq.; Articles 2, 5, 6, 12, 13, 14, 17, 33, 35 of the collective bargaining agreement between the letter carrier union and the postal service; based solely on plaintiff's handicap. The anti-conspiracy act, 42 USC SEC.

1985 et. seq. USCA CONST. AMENDMENT 14 AND AMENDMENT 5.

In the body of his complaint, Suttles appears to delineate six causes of action, with no cause of action numbered three: (1) conspiracy; (2) violations of the Rehabilitation Act; (4) retaliation, handicap discrimination, and constructive discharge; (5) breach of contract; and (6) violations of the Postal Reorganization Act.

## III. *Analysis*

### A. *Summary Judgment Standard*

■■■ Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire*

*Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

### B. *Conspiracy*

■■■ A person injured as the result of a conspiracy to interfere with his civil rights may bring an action under 42 U.S.C. § 1985. Subsection 1 relates to a conspiracy to prevent a public official from performing his duty; Subsection 2 relates to a conspiracy to obstruct justice or to intimidate a party, a witness, or a juror; and Subsection 3 concerns the acts of two or more persons conspiring to deprive any person of certain civil rights. *Holdiness v. Stroud,* 808 F.2d 417, 424 (5th Cir.1987). Although Suttles does not specify the subsection upon which he relies, it appears that he is attempting to invoke Subsection 3. Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more conspirators.

■■■ To state a claim under 42 U.S.C. § 1985(3), the plaintiff must allege: (1) a conspiracy involving two or more persons;

(2) for the purpose of depriving, either directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners of Am. v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–57, 77 L.Ed.2d 1049 (1983); *Hilliard v. Ferguson,* 30 F.3d 649, 652–53 (5th Cir.1994); *Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 757 (5th Cir.1987). The plaintiff must also assert "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *see Hilliard,* 30 F.3d at 653 (citing *Burns–Toole v. Byrne,* 11 F.3d 1270, 1276 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994)); *Mississippi Women's Medical Clinic v. McMillan,* 866 F.2d 788, 793 (5th Cir.1989).

In his attempt to come within the ambit of § 1985, Suttles alleges in his first amended complaint:

Defendants were motivated by an invidious class-wide discriminatory animus against persons with handicapping condition of asthma (severe airways disease), in their arbitrary and perfunctory conduct towards plaintiff, Dony Suttles.

Defendant agreed to deprive plaintiff Dony Suttles of his rights as a person with a disability.

Defendants acted overtly and in concert in furtherance of this conspiratorial agreement.

Defendants via station managers, superintendents, immediate supervisors, EEOC office and representatives, Zoie Covert (owcp control office), and et. [sic] al., acted in concert by supporting or promoting perjured testimony, altered documents, destroying or failing to create records/programs, concealment, repudiation of the collective bargaining agreement and procedures, mail tampering, and misinformation.

plaintiff [sic] was damaged by this conspiracy in that he was caused to suffer discrimination based solely on his disability, emotional distress, loss of employment wages and benefits, and loss of opportunities for career advancement.

In his response to the defendants' motion for summary judgment, Suttles contends that the defendants conspired with respect to his claim for workers' compensation benefits. Suttles claims that the "first of many continuous conspiratory activities took place at Eastwood station when plaintiff filed his CA2 [workers compensation form] alleging on the job illness of occupational disease 11–16–90 for severe asthma and allergy rhinitis." According to Suttles, "Mr. Gallis the supervisor completing the CA2 was evasive, inaccurate and incomplete." Suttles states, "Nonetheless, this occupational disease form was followed by an accident report form completed by station superintendent Loraine Powlak and immediate supervisor Shawn Herrera, concerning the same date of injury (7–2–90)." Suttles next alleges that there were two or more acting in furtherance. Suttles claims that "[u]nder the leadership of Ms [sic] Powlak and in obvious agreement of Mr. Shawn Herrera the accident report was completed using codes only the mgmt [sic] understood." Suttles asserts that "[t]his same report is void of any assigned report number or signature of safety official." Suttles states that the form is stamped by the control office OWCP on 12–17–90. He argues that "Mrs. Zoie Covert was in charge of the plaintiff claim and it is alleged that the accident form was accepted with full knowledge of its impropriety." Suttles also contends that "in furtherance of this plot [there was] a subsequent letter drafted by Herrera dated December 7, 1991 but received at the control office on January 1991." Suttles alleges that the "[m]aterial fact that stands out here is the content of my [sic] Herrera's letter." According to Suttles, "Mr. Herrera stated in his letter that Mr. Suttles has been hospitalized two times none of which was job related but his personal condition." Suttles argues that there has been medical documentation dating back to August 3, 1990, showing that his condition was job related.

■■■ To the extent that Suttles is alleging a conspiracy within the Postal Service,

the intracorporate conspiracy doctrine applies. Under the intracorporate conspiracy doctrine, a corporation cannot conspire with itself through its agents or employees when the acts of the agents or employees are within the scope of their employment. *See Larson v. Miller*, 76 F.3d 1446, 1456 n. 6 (8th Cir.1996); *Muzquiz v. W.A. Foote Memorial Hosp., Inc.*, 70 F.3d 422, 429 (6th Cir.1995). Applying the doctrine to a § 1985(3) claim, the Fifth Circuit noted that "[i]t is a longstanding rule in this circuit that a 'corporation cannot conspire with itself anymore than a private individual can, and it is the general rule that acts of the agent are the acts of the corporation.' " *Hilliard*, 30 F.3d at 653 (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied*, 345 U.S. 925 (1953)). "The intracorporate conspiracy doctrine is equally applicable to governmental entities...." *Larson*, 76 F.3d at 1456 n. 6; *see Hilliard*, 30 F.3d at 653. Because a governmental body cannot conspire with itself and the individual members of the body, acting in their official capacity, Suttles cannot maintain a conspiracy claim against the Postal Service under § 1985(3) in these circumstances.

■ Moreover, in his amended complaint, Suttles fails to plead sufficient facts to assert a claim under any of the subsections of § 1985. He, likewise, fails to present adequate summary judgment evidence to raise a fact issue with respect to such a claim. The Fifth Circuit has noted that "[t]he heart of the cause of action accorded by § 1985 is a conspiracy to interfere with a person's civil rights. The essence of a conspiracy is an

understanding or agreement between the conspirators." *Holdiness*, 808 F.2d at 424–25. Other than Suttles' own conclusory allegations, there is no evidence in the record that the defendants agreed to conspire with any person or entity to discriminate against handicapped individuals or any other class of persons.[1] " 'Plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient.' " *Young v. Biggers*, 938 F.2d 565, 569 (5th Cir.1991) (quoting *Lynch v. Cannatella*, 810 F.2d 1363, 1369–70 (5th Cir.1987)); *see generally Dayse v. Schuldt*, 894 F.2d 170, 173 (5th Cir.1990) (quoting *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir.1982)); *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1095 (5th Cir.1989), *cert. denied*, 493 U.S. 1069, 110 S.Ct. 1109, 107 L.Ed.2d 1017 (1990); *Holdiness*, 808 F.2d at 424; *Russell v. Millsap*, 781 F.2d 381, 383 (5th Cir.1985), *cert. denied*, 479 U.S. 826, 107 S.Ct. 103, 93 L.Ed.2d 53 (1986). Accordingly, because intra-governmental conspiracies are not actionable and Suttles has not adduced sufficient evidence to raise a fact issue concerning the existence of a conspiracy, summary judgment on this claim is proper.

## C. *Rehabilitation Act*

■ Suttles alleges that the defendants discriminated against him with respect to his disabled status under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"). The Rehabilitation Act provides in pertinent part:

No otherwise qualified individual with a disability ... shall, solely by reason of her

---

1. Because summary judgment is proper on this basis, it is not necessary for the court to address whether disabled persons are a protected class under § 1985(3). There is a split among the circuits on this issue. The Second and Eighth Circuits have held that § 1985(3)'s protection extends to disabled persons as a class. *See Larson*, 76 F.3d at 1454–55; *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 42 (2d Cir.1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir.1983); *see also Trautz v. Weisman*, 819 F.Supp. 282, 290–95 (S.D.N.Y.1993); *Tyus v. Ohio Dep't of Youth Servs.*, 606 F.Supp. 239, 245–47 (S.D.Ohio 1985). The First, Seventh, and Tenth Circuits have held that it does not. *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1485–87 (7th Cir.1985); *Wilhelm v. Continental*

*Title Co.*, 720 F.2d 1173, 1176–77 (10th Cir. 1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984); *Downs v. Sawtelle*, 574 F.2d 1, 16 (1st Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *see also Moreno v. Commonwealth of Pa.*, No. Civ. A. 89–5730, 1991 WL 46472, at *8 (E.D.Pa. Apr. 1, 1991); *Corkery v. SuperX Drugs Corp.*, 602 F.Supp. 42, 44 (M.D.Fla.1985); *Cain v. Archdiocese of Kansas City*, 508 F.Supp. 1021, 1027 (D.Kan.1981); *McNutt v. Hills*, 426 F.Supp. 990, 1002 n. 27 (D.D.C.1977). The Third Circuit dismissed the plaintiff's claim on other grounds, but recognized the split of authority. *W.B. v. Matula*, 67 F.3d 484, 503 n. 15 (3d Cir.1995). The Fifth Circuit has not addressed the issue.

or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). "[T]he basic purpose of § 504 ... is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or ignorance of others." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987); *see also Chandler v. City of Dallas,* 2 F.3d 1385, 1389–90 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Chiari v. City of League City,* 920 F.2d 311, 315 (5th Cir.1991) (citing *Traynor v. Turnage,* 485 U.S. 535, 548, 108 S.Ct. 1372, 1381–82, 99 L.Ed.2d 618 (1988)).[2] Accordingly, "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979).

██ In order to qualify for relief under the Rehabilitation Act, the plaintiff must show: (1) he was an "individual with a handicap;" (2) he was an "otherwise qualified individual;" (3) he worked for a "program or activity" that received federal financial assistance; and (4) he was adversely treated solely because of his handicap. *Chandler,* 2 F.3d at 1390; *Chiari,* 920 F.2d at 315. The burden of proof is on the plaintiff to prove each of these elements in order to establish a *prima facie* case of discrimination under the Rehabilitation Act. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

It is readily apparent that Suttles' job with the Postal Service falls within the purview of the Rehabilitation Act's definition of a "program or activity"—satisfying the third element of a *prima facie* case. *See* 29 U.S.C. § 794(b)(1)(A). The defendants, however, contend that Suttles has failed to establish a *prima facie* case, arguing that he is not a disabled person as defined by the Act and he has not shown that he is an "otherwise qualified individual."

### 1. *Individual With a Disability*

The threshold issue of a claim under the Rehabilitation Act is whether the plaintiff is disabled as defined in the Rehabilitation Act. *See Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1,* 909 F.2d 820, 825 (5th Cir.1990). The plaintiff must prove he is disabled as defined by the statute. *Florence v. Frank,* 774 F.Supp. 1054, 1061 (N.D.Tex.1991) (citing *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1248 (6th Cir.1985)). For employment purposes, the Act defines "an individual with a disability" as

> any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(8)(B). The Department of Health and Human Services' regulations have been found to be significant in identifying handicapped individuals who qualify for relief under the Act because the regulations were drafted with Congressional oversight and approval and were intended to implement the Act. *See School Bd. of Nassau County,* 480 U.S. at 280, 107 S.Ct. at 1127; *Chandler,* 2 F.3d at 1390; *Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989). Physical or mental impairment is defined by the regulations as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory...." 45 C.F.R. § 84.3(j)(2)(i). Major life activities have been defined to mean "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii). The regulations state that having a record of such an impairment

---

**2.** The Rehabilitation Act was amended October 29, 1992, and among the changes to the Act was the substitution of the term "individual with a disability" for the original term "individual with handicaps." Consequently, earlier case law references may reflect this superseded "handicap" terminology.

means "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 45 C.F.R. § 84.3(j)(2)(iii). Finally, the phrase "is regarded as having such an impairment" means, *inter alia*, "is treated ... as having such an impairment." *Leckelt*, 909 F.2d at 825 (citing 45 C.F.R. § 84.3(j)(2)(iv)(C) (1989); *Carter v. Orleans Parish Pub. Schs.*, 725 F.2d 261, 262–63 (5th Cir.1984) (per curiam)).

Here, the defendants contend in their motion for summary judgment that Suttles' asthma has been successfully controlled by medication since he resigned from the post office. The defendants point out that he is no longer exposed to the dust, smoke and perfumes (in mail samples) to which he is allergic and which trigger his asthma attacks, nor is he required to be outdoors for extended periods. Thus, although Suttles' asthma clearly caused him significant breathing difficulties when he was exposed to certain substances as a mail carrier, he has fully recovered since his change in work environment. The defendants assert that even though Suttles cannot work as a letter carrier because he would be exposed to substances to which he is highly allergic and which can cause life-threatening asthma attacks, he can function normally as long as he takes his medication and avoids extended exposure to dust allergens, fumes, and smoke. According to the defendants, Suttles can work safely in an office environment. Therefore, the defendants contend that while his asthma precludes him from working as a letter carrier, Suttles is not disabled for purposes of the Rehabilitation Act.

Similar to the case at bar, in *Heilweil*, the plaintiff, who was responsible for administering a hospital blood bank, had asthma. 32 F.3d at 719–20. It was determined that Heilweil was allergic to particular fumes within the blood bank, as her health improved as long as she stayed out of the blood bank. *Id.* The hospital discharged Heilweil because she could not serve in her administrative capacity unless she entered the blood bank regularly, which was something she could not do without becoming ill. *Id.* at 720–21. The court in *Heilweil* found that "[a]n impairment which disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." 32 F.3d at 723 (citing *Jasany*, 755 F.2d at 1249 n. 3). It is well established that " '[a]n impairment that interferes with an individual's ability to do a particular job, but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not 'substantially limiting' for purposes of the Rehabilitation Act.' " *Chandler*, 2 F.3d at 1392–93 n. 34 (quoting *de la Torres v. Bolger*, 610 F.Supp. 593, 596–97 (N.D.Tex. 1985), *aff'd*, 781 F.2d 1134 (5th Cir.1986)); *see, e.g., Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992); *Maulding v. Sullivan*, 961 F.2d 694, 698 (8th Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *Daley*, 892 F.2d at 215; *Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir.1986); *Jasany*, 755 F.2d at 1248–49; *Miller v. AT & T Network Sys.*, 722 F.Supp. 633, 639 (D.Or.1989), *aff'd*, 915 F.2d 1404 (9th Cir.1990); *Elstner v. Southwestern Bell Tel. Co.*, 659 F.Supp. 1328, 1342–43 (S.D.Tex. 1987), *aff'd*, 863 F.2d 881 (5th Cir.1988). Relevant to the inquiry of whether a particular impairment is a disability under the Act are "the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job expectations and training." *Forrisi*, 794 F.2d at 933 (quoting *Jasany*, 755 F.2d at 1249).

Here, Suttles' deposition testimony establishes that he does not suffer a substantial limitation of major life activities. He is not precluded from working indoors where a moderate amount of dust is present. In fact, Suttles testified at deposition that after his resignation he attended paralegal training school and obtained an associate degree in legal assistance. Suttles further testified that he has obtained temporary positions with law firms, with his main source of income being an office position with an insurance company as an agent. Suttles further testified that after leaving the Postal Service, his condition has remained stable with medication and visits every three or four months to Dr. Cross. Dr. Cross, Suttles' treating

physician, testified at deposition that Suttles is on medication and is in relatively good control of the asthma.

Accordingly, Suttles is not an individual with a disability as defined under the Rehabilitation Act.

### 2. *"Otherwise Qualified Individual"*

If Suttles' asthma were considered to be a disability, to recover under the Rehabilitation Act, he must show that he is "otherwise qualified" to function as a mail carrier. *Chandler,* 2 F.3d at 1394. "If a plaintiff is not an otherwise qualified handicapped individual, there cannot be discrimination in violation of the Rehabilitation Act." *Florence,* 774 F.Supp. at 1061.

■ An "otherwise qualified individual" is "one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College,* 442 U.S. at 406, 99 S.Ct. at 2367; *see also Chandler,* 2 F.3d at 1393. Such a person must be capable, with or without reasonable accommodation, of performing the essential functions of his job. *Id.* The Department of Labor regulations define a qualified individual with handicaps to mean with respect to employment, one "who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others...." 29 C.F.R. § 1614.203(a)(6). An individual is not qualified if there is a genuine substantial risk that he or she could be injured, and the employer cannot modify the job to eliminate the risk. *Chandler,* 2 F.3d at 1393; *Chiari,* 920 F.2d at 317.

■ The Fifth Circuit has established a two-prong test to determine whether an individual is "otherwise qualified" under the Rehabilitation Act. *See Chandler,* 2 F.3d at 1393 (citing *Chiari,* 920 F.2d at 315). First, the court must determine whether the individual can perform the essential functions of the job. *Id.* Second, if a plaintiff is not able to perform the essential functions of the job, then the court must determine whether any "reasonable accommodation" by the employer would enable him to perform those functions. *Id.* The employer need not accommo-

date a disabled individual by eliminating one of the essential functions of the position. *Jasany,* 755 F.2d at 1250. Thus, if the disability will prevent an individual from performing the position in question, then he cannot be found to be "otherwise qualified."

#### a. *Essential Functions of Job*

■ "The employer is not required to accommodate a handicapped person by eliminating one of the essential functions of his job." *Florence,* 774 F.Supp. at 1061. In addition, the Rehabilitation Act imposes no requirement that the employer lower or effect substantial modifications of standards to accommodate a handicapped person. *Jasany,* 755 F.2d at 1250–51 (citing *Southeastern Community College,* 442 U.S. at 413, 99 S.Ct. at 2370–71); *see also Alexander v. Frank,* 777 F.Supp. 516, 524 (N.D.Tex.1991); *Black v. Frank,* 730 F.Supp. 1087, 1091 (S.D.Ala. 1990).

■ In the case at bar, the defendants contend that Suttles managed to perform the essential functions of the job of letter carrier, but that he did so at great risk to his health and his life. The defendants point out that Suttles' history of repeated hospitalizations and emergency room visits leaves no doubt that he cannot work as a mail carrier. Attached to the defendants' motion for summary judgment as Exhibit 7 is a document that appears to be part of a certificate of medical examination with a section entitled "Brief Job Description of What Position Requires Employee to do." This section states:

> Carriers are responsible for the prompt and efficient delivery and collection of mail on foot or by vehicle under varying conditions in a prescribed area or on various routes. They must work in all kinds of weather and may be required to drive motor vehicles in all kinds of traffic and road conditions and to deliver parcel post from trucks and make collections of mail from various boxes in the city. Carriers are required to carry on their shoulder pouches weighing as much as 35 pounds and to load and unload full sacks of mail weighing up to 70 pounds from trucks.

The defendants point out that under a section of the certificate of medical examination entitled "environmental factors," it shows that carriers are exposed to dust, and that they must work outside, in excessive heat, cold, dampness, and/or humidity. Also included with defendants' Exhibit 7 is a document entitled "Standard Operating Procedures." This document appears to describe in detail the duties of a letter carrier, including casing mail. From these documents, as well as Suttles' own statements, it is apparent that letter carriers must work in an environment that exposes them to dust, fumes, smoke, and pollen. The defendants argue that there is no way to eliminate these allergens.

At deposition, Dr. Cross testified that it was his opinion that Suttles "will not be able to work at his previous occupation because of dust allergens, fumes or smoke." When asked to what previous occupation he was referring, Dr. Cross answered, "I assume working in the post office." Dr. Cross was questioned whether he thought it was possible for Suttles to work safely in the post office at his previous position as a mail carrier if he wore a dust mask. Dr. Cross responded that he could not say that the mask would completely protect him. "It would be a trial-and-error type of thing."

### b. *Reasonable Accommodation*

As Suttles was not otherwise qualified for a letter carrier position in the absence of employer accommodation, it must be determined whether any reasonable accommodation by the defendants would have enabled Suttles to perform the essential functions of a letter carrier.

 When the issue of reasonable accommodation is raised, the burden of persuasion in proving inability to accommodate always is on the employer. *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 310 (5th Cir. [Unit A] 1981). Once the employer presents credible evidence that reasonable accommodation is not possible or practicable, however, the plaintiff must bear the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made. *Id.*

Suttles claims that the failure of the Postal Service to reassign him to another position violated the Rehabilitation Act. Suttles, however, does not identify a specific vacant position to which he should have been reassigned. Suttles merely asserts that he sought a light duty assignment away from the exposures at the letter cases and letter carrier craft as a reasonable accommodation. When Suttles was asked at deposition if he basically wanted another job, he responded, "That's all I ever wanted to just get away from the environment. I told them I would take anything, you know, just as long as I could get away from the letter cases ... [a]nd of course, outside. Because whenever it rained, however cold it was, I still had to go out just like everybody."

 As a general proposition, the Rehabilitation Act does not require an employer to reassign a handicapped employee to a vacant position, even if he is qualified to perform the work. *See Fedro v. Reno,* 21 F.3d 1391, 1395 (7th Cir.1994); *see also Myers v. Hose,* 50 F.3d 278, 284 (4th Cir. 1995); *Jasany,* 755 F.2d at 1250–51. In a similar situation, the Fourth Circuit held that a postal employee, whose asthma prevented him from performing the requirements of his job as a laborer-custodian, was not entitled to reassignment to another position. *Carter v. Tisch,* 822 F.2d 465, 467–68 (4th Cir.1987). "The case law is clear that, if a handicapped employee cannot do his job ... the employer is not required to assign him to alternative employment." *Id.* at 467. The United States Supreme Court commented in dicta:

> Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.

*School Bd. of Nassau County,* 480 U.S. at 289 n. 19, 107 S.Ct. at 1131 n. 19. "Although in dicta, such language suggests that an employer is not required to find alternative employment for an employee who cannot perform his job unless the employer normal-

ly provides such alternative employment under its existing policies." *Carter*, 822 F.2d at 467. Thus, the Rehabilitation Act merely prohibits an employer from denying reassignment that is reasonably available under its own regulations. *See Bradley v. University of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 925 (5th Cir.1993), *cert. denied*, 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994).

Here, the defendants contend that reassignment would violate the terms of the Postal Service's collective bargaining agreement. *See Guillot v. Garrett*, 970 F.2d 1320, 1326 (4th Cir.1992); *Shea v. Tisch*, 870 F.2d 786, 789 (1st Cir.1989); *Carter*, 822 F.2d at 467–68. The defendants point out that Article 13 of the National Agreement addresses the reassignment of employees who have illnesses or injuries that were not caused on the job.[3] According to Kinsel's declaration, Article 13 requires, *inter alia*, that employees who are permanently reassigned meet all of the qualifications of the new position. The defendants argue that Article 13.4(B) and (C) provide that reassignments may not be made to the detriment of regular employees who have fixed schedules. Kinsel asserts in her declaration, which is unrefuted, that Article 13 does not require the Postal Service to create new positions for ill or injured workers, nor does it require the Postal Service to create work for them to do within their medical restrictions. Moreover, in ¶ 9 of her declaration, Kinsel asserts:

> There are no jobs available at Eastwood, Roy Royal [sic], or any other station in the Houston District that does not require extensive contact with the mail and the dust, paper mites, perfumes and other allergens that accompany mail. In addition, all letter carriers must go outdoors to make their deliveries. There are maintenance and clerical positions that may require less

contact with mail. However, there is still some exposure to mail and its attendant allergens as the positions require employees to be in the same work area. Furthermore, like all bargaining-unit positions in the postal service they are awarded by competitive bidding with seniority playing the major role in determining to whom they are assigned. To the extent there may be a timing-keeping job in a station that is somewhat less proximate to mail and the outdoors, such positions are highly sought after and must be obtained through competitive bidding by employees. Moreover, to the extent that Mr. Suttles' condition could be assuaged by being assigned to a mounted-route, or a routes [sic] with apartments and high rises, he like other letter carriers is entitled to bid on such positions on a city-wide basis. In the carrier craft this process is governed by Article 41. If Mr. Suttles bid on such routes and was not awarded them, it is only because he did not have sufficient seniority to obtain the route which the succesfull [sic] bidder did.

Hence, the defendants argue that the option of reassigning Suttles to another position did not reasonably exist because Suttles would have been exposed to allergens in any position in postal installations. The defendants note that the positions with arguably more limited exposure to mail, like all bargaining-unit positions, are subject to the competitive bidding procedures established in the collective bargaining agreement. Suttles, furthermore, makes no showing that he submitted bids for any of these positions.

■ The record is devoid of any evidence that reasonable accommodation was possible in order for Suttles to maintain his position as a letter carrier, much less eliminate any health or safety risk to him. Moreover, Sut-

---

3. Paragraph 8 of the declaration of Donna H. Kinsel ("Kinsel"), a Senior Labor Relations Specialist for the Houston District of the United States Postal Service, states, "The treatment of workers who have injuries or illnesses caused by their employment is significantly different because of the Federal Employees Compensation Act, 5 U.S.C. section 8102." Here, Suttles' asthma does not appear to have been caused by his job as a letter carrier, but merely aggravated by

it. Suttles' medical records indicate that he first had asthma when he was working in a warehouse while serving in the military, almost a decade before he was hired by the Postal Service. In addition, his alleged disability does not appear to be a "disabling traumatic injury" as required by the regulations implementing the Federal Employees' Compensation Act. *See* 20 C.F.R. § 10.207(a)(4).

tles has not demonstrated the availability of another position. *See Bradley,* 3 F.3d at 925. As previously noted, an employer is not required to "accommodate a handicapped employee by restructuring a job in a manner which would usurp the legitimate rights of other employees in a collective bargaining agreement." *Jasany,* 755 F.2d at 1251–52. The regulations provide in pertinent part under subsection (g) *Reassignment:*

> For the purpose of this paragraph, an employee of the United States Postal Service shall not be considered qualified for any offer of reassignment that would be inconsistent with the terms of any applicable collective bargaining agreement.

*See* 29 C.F.R. § 1614.203(g). Thus, Suttles' contention that the defendants acted in violation of the Rehabilitation Act by not reassigning him to a different job is without merit.

Accordingly, Suttles is unable to establish a *prima facie* case of discrimination under the Rehabilitation Act.

D. *Retaliation and Constructive Discharge*

In his fourth cause of action, Suttles asserts claims for retaliation and constructive discharge, as well as handicap discrimination, which is addressed above.

### 1. *Retaliation*

■■■■ Title VII prohibits employers from retaliating against an employee who opposes what he reasonably believes to be an unlawful employment practice. 42 U.S.C. § 2000e–3(a); *see also Wells v. Hutchinson,* 499 F.Supp. 174, 196 (E.D.Tex.1980); 29 C.F.R. § 1614.101(b). Retaliation under Title VII is an action taken by an employer against an employee because of the employee's opposition to perceived discriminatory practices. *De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 852 n. 1 (5th Cir.1982). To establish a *prima facie* case of retaliation in violation of Title VII, the plaintiff must show that: (1) he participated in statutorily protected activity; (2) an adverse employment action occurred; and (3) a causal connection exists between the protected activity and the adverse action. *See Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1092 (5th Cir.1995);

*Pierce v. Texas Dep't of Criminal Justice, Inst. Div.,* 37 F.3d 1146, 1151 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995); *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir. 1994); *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992); *Jones v. Flagship Int'l,* 793 F.2d 714, 724 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Hamilton v. Rodgers,* 791 F.2d 439, 441–42 (5th Cir.1986). In order to maintain an action for retaliation, an employee need only establish that he had a reasonable belief that discriminatory practices existed. *De Anda,* 671 F.2d at 853 n. 2. In addition, the employee must show that his opposition to unlawful activity was a motivating or determining factor in his termination, *i.e.,* there must be a causal connection. *Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983). Thus, the plaintiff must show that he would not have been subjected to the adverse action "but for" the protected activity. *See Mayberry,* 55 F.3d at 1092; *Jack,* 743 F.2d at 1131.

Suttles claims in his amended complaint that the Postal Service retaliated against him for "filing EEO against managers for not processing form 991." Suttles contends that he "was forced to work under aggravated intolerable working condition continuously since date of injury 7/2/90." Suttles further alleges that he "was intentionally discriminated against based solely on his handicap which denied reasonable accommodations." Finally, Suttles claims that he "was denied reassignment to which he was qualified while other handicap employees unable to do their usual jobs were reassigned."

The defendants contend in their motion for summary judgment that Suttles has failed to establish a *prima facie* case of retaliation because he has not set forth any allegedly retaliatory acts and has not identified the protected activity that provoked the retaliation. Defendants argue that the failure to forward a handwritten application is not an adverse employment action. The defendants further contend that Suttles has shown no

causal link between a protected activity and an adverse employment action.

Contrary to the defendants' assertions, Suttles has identified protected activity in which he engaged, including "filing an EEO against managers for not processing form 991" and filing his first EEOC charge on March 24, 1992, alleging handicap discrimination and reprisal. With respect to the defendants' contention that Suttles has not explained any allegedly retaliatory acts, Suttles claims in his response to defendants' motion for summary judgment that "[m]anagers retaliated against the plaintiff for filing EEOC's going AWOL 5–11–92 and other protected activity [sic] culminating in excessing plaintiff as the only means to force plaintiff to leave Royal [sic] Royal station."

Other than Suttles' allegation that the retaliation culminated in his being excessed as a means to force him to leave the Roy Royall station, Suttles does not specifically identify how he was retaliated against by managers for filing EEOC charges, going AWOL on 5–11–92, or other protected activity, which is not detailed. In his first amended complaint, Suttles alleges that he was forced to work under intolerable working conditions continuously since date of injury 7/2/90. This allegation, however, appears to be directed toward his constructive discharge claim, not his retaliation claim. Suttles also alleges in his amended complaint that he was denied reassignment for which he was qualified while other handicapped employees unable to do their usual jobs were reassigned. It is not clear whether this allegation is in reference to Suttles' retaliation or constructive discharge claim, or both. In any event, Suttles does not state what reassignment he was denied, the names of handicapped employees unable to do their job who were reassigned, the nature of the handicap of those individuals, the basis for his belief that they were unable to do their usual jobs, where and how they were reassigned, etc.

In his response to defendants' motion for summary judgment, however, under the heading "comparisons," Suttles alleges that exhibit 1 demonstrates a "handicap[ped] carrier unable to carry mail but received reassignment" that was under a limited duty restriction as he was. Suttles claims that exhibit 2 shows a "non-handicapped carrier reassigned numerous time [sic] while still classified as letter carrier." With respect to exhibit 1, Suttles attaches a letter, which is stamped "comparison 1," from the Injury Compensation Office to the Manager at the Roy Royall station regarding a station employee, Jerry W. Crowe ("Crowe"). The letter dated August 12, 1993, indicates that on May 11, 1991, Crowe, a letter carrier, injured his knee as he pushed his stalled postal vehicle out of an intersection. The letter states that "[a] suitable rehab assignment should be identified keeping his restrictions in mind." Suttles also attaches what appears to be a medical record received by the injury compensation office on June 17, 1992, and a notification of personnel action regarding Crowe effective May 13, 1992. The medical record states a restriction that "pt is to not return as a letter carrier." Suttles also includes a work restriction evaluation dated August 5, 1993, and notification of personnel action effective September 7, 1991, for Dorotheya Lindley ("Lindley"). The work restriction evaluation, stamped by Suttles "comparison 2," declares in the remarks section that "patient has 15% disability to the lower extremity. Patient may need permanent job replacement with these restrictions." Finally, as "comparison 3," Suttles affixes a notification of personnel action for Louis Smith ("Smith") effective October 3, 1992.

In addition, Suttles claims that the "postal service has stand [sic] policy of reassignment as evidenced by the sucessful [sic] bidders on the business service rep job. Defendant presented no evidence plaintiff was not qualified for this job. Should have received." After this page of his response, Suttles includes a part of a newsletter with an article entitled "Houston Customers Praise Business Center Representative." He also attaches various applicant information forms for the business representative position.

Suttles appears to be making a comparison between his situation and that of Crowe, Lindley, and Smith. As to these individuals, Suttles presents limited or no information concerning the specific nature of their al-

leged disabilities, whether their disabilities were caused by on-the-job injuries, whether their disabilities were permanent, their seniority level, their qualifications, or whether they obtained alternative positions through competitive bidding. In addition, Suttles adduces no evidence that he was qualified for or had sufficient seniority to be considered for the business service representative job, much less better qualified or more senior than the employee who was the successful bidder. Without such information, there is inadequate evidence to indicate that Suttles was treated differently from similarly situated employees. Moreover, even if these employees were treated differently, Suttles has made no showing that the disparate treatment is attributable to retaliation against him for engaging in protected activity.

■ With respect to his allegation that he was excessed as a means of forcing him to leave the Roy Royall station, Suttles has not provided any summary judgment evidence to support his conclusion. Rather, Suttles attached to his response the letter he received from Robertson on June 4, 1992. This letter states:

Due to recently completed route examinations and adjustments, a management determination has been made to reduce the authorized full time letter carrier complement at Royall Post Office.

You will become an unassigned regular letter carrier *EXCESS* to the needs of this section, effective June 8, 1992. You will, however, be allowed to remain in the section on your present schedule until June 26, 1992. After that time, you will be reassigned to another unit. You should exercise your seniority to bid city-wide. You will have retreat and/or any appropriate salary rate protection in accordance with the National Agreement.

In his own handwriting, Suttles wrote on the letter that "[t]hey were getting ready to send me to some other station which meant I would have [sic] beg for mask, vehicle and cleaning of case. I had to file 2 EEO's before getting mask at the station."

Suttles has not demonstrated that being excessed was an adverse employment action. The letter confirms that Suttles would retain his salary wherever he bid or was transferred. It appears from Suttles' own handwritten note on the letter that he simply did not want to transfer to another station, not that he was being treated adversely in retaliation for filing an EEO claim.

■ Even assuming *arguendo* that his being excessed was an adverse employment action, Suttles has not shown a causal link between his filing an EEOC charge and being excessed. The letter evidences that the Roy Royall station realigned postal routes and fewer carriers were needed to handle the new routes. All non-senior letter carriers no longer needed at the Roy Royall station were issued excessing letters whereby they could bid for jobs at other stations. Suttles was treated no differently than the other non-senior employees. Suttles had voluntarily relinquished his seniority when he transferred to Chattanooga in 1985 and back again to Houston in 1987. There is nothing in the record but Suttles' own allegation that he was excessed as a means of forcing him to leave the Roy Royall station. Suttles' subjective belief of discrimination, however genuine, cannot be the basis for judicial relief. *See, e.g., Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.1996); *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996); *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Little v. Republic Refining Co.,* 924 F.2d 93, 96 (5th Cir.1991); *Sherrod v. Sears, Roebuck & Co.,* 785 F.2d 1312, 1316 (5th Cir.1986); *Elliott v. Group Medical & Surgical Serv.,* 714 F.2d 556, 566–67 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984).

Hence, Suttles has not adduced any evidence of a causal link between any protected activity in which he had engaged and an adverse employment action by the defendants. Therefore, Suttles' retaliation claim is

without sufficient factual basis to withstand summary judgment.

### 2. *Constructive Discharge*

A constructive discharge occurs when an employer makes an employee's working conditions so intolerable that a reasonable employee would have felt forced to resign. *Barrow,* 10 F.3d at 298; *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990); *Junior v. Texaco, Inc.,* 688 F.2d 377, 378 (5th Cir.1982); *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir. 1975). To determine whether a constructive discharge has occurred, the plaintiff's actions must be analyzed from the standpoint of a "reasonable employee." *Boze,* 912 F.2d at 804; *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980). The working conditions must have been "so difficult or unpleasant that [a] reasonable person in [the plaintiff's] shoes would have felt compelled to resign." *McKethan v. Texas Farm Bureau,* 996 F.2d 734, 741 (5th Cir.1993), *cert. denied,* 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994) (citing *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 242 (5th Cir. 1993)). The plaintiff's actions must be evaluated objectively, without regard to the "employee's subjective preference for one position over another." *Epps v. NCNB Texas,* 7 F.3d 44, 46 (5th Cir.1993) (citing *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 755 (5th Cir.1986), *remanded in part on other grounds,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). In *Barrow,* the court listed some factors relevant singly or in combination to the inquiry of whether a reasonable employee would feel compelled to resign: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not." 10 F.3d at 297 and n. 20.

Suttles bases his claim for constructive discharge on the same allegations as previously noted in his retaliation claim—he was forced to work under aggravated, intolerable working conditions; he was intentionally discriminated against based solely on his handicap and denied reasonable accommodations; and, he was denied reassignment to a job for which he was qualified while other handicapped employees unable to do their usual jobs were reassigned.

The defendants maintain that Suttles resigned on June 5, 1992, after learning that he and eight other carriers were to be excessed to another station. The defendants assert that the reasons Suttles gave for his resignation—inability to accommodate his medical condition, absence of another comparable position, excessing him to another station, and a workers' compensation order denying him benefits—do not constitute constructive discharge. The defendants argue that Suttles' resignation was attributable to his personal frustration rather than to any mistreatment by the Postal Service.

As to Suttles' claim of intolerable working conditions, the challenged working conditions must be viewed objectively by examining the specific conditions imposed by the Postal Service, not by viewing Suttles' state of mind. *Epps,* 7 F.3d at 46 (citing *Jett,* 798 F.2d at 755); *Shawgo v. Spradlin,* 701 F.2d 470, 481 n. 12 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). To prevail, however, the employee need not show that the employer imposed intolerable conditions with the specific intent of forcing the employee to resign. *Boze,* 912 F.2d at 804; *Jurgens v. EEOC,* 903 F.2d 386, 390 (5th Cir.1990). Here, Suttles' assertion that he was forced to work under aggravated, intolerable working condition continuously since the date of injury 7/2/90 is merely Suttles' own perception. The Postal Service attempted to accommodate him in various ways, *i.e.,* by allowing him to use his own vehicle, changing his assignment in order to abide by his doctor's work restriction of being outdoors for no more than four and a half hours a day, providing dust masks, permitting Suttles to work indoors after he received an updated work restriction that he was not to work outdoors, etc. Relocation to another work site is not among the relevant factors delineated by the court in *Barrow* to deter-

mine whether a reasonable employee would have felt compelled to resign. *See* 10 F.3d at 297. The Fourth Circuit has warned of the danger posed by an employee claiming constructive discharge because the employer would not reasonably accommodate a disability, cautioning that such a legal theory would "convert every violation of the Rehabilitation Act into a potential claim for constructive discharge." *Johnson v. Shalala,* 991 F.2d 126, 127 (4th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 52, 130 L.Ed.2d 12 (1994).

Because Suttles has neither described any working conditions that would be considered intolerable by a reasonable person, nor has he demonstrated that he was reasonable in resigning from the Postal Service instead of bidding for or being transferred to another position, Suttles has failed to make an adequate factual showing to defeat summary judgment on his claim of constructive discharge.

### E. *Breach of Contract and Postal Reorganization Act*

The defendants maintain that they are entitled to summary judgment on Suttles' claims of breach of contract and violation of the Postal Reorganization Act because these claims are barred by the statute of limitations and Suttles failed to exhaust the grievance and arbitration procedures contained in the collective bargaining agreement.

The relationship between the Postal Service and its employees' bargaining representatives is governed by the Labor Management Relations Act. ("LMRA"), 29 U.S.C. § 141 *et seq.,* which is made applicable to matters involving the Postal Service by the Postal Reorganization Act, 39 U.S.C. §§ 1209(a) and (b). *McNair v. United States Postal Serv.,* 768 F.2d 730, 735 (5th Cir.1985). Under § 2 of the Postal Reorganization Act, federal courts have jurisdiction of disputes arising under collective bargaining agreements executed by the Postal Service. 29 U.S.C. § 1208(b). That section is the "analogue" of § 301(a) of the LMRA, 29 U.S.C. § 185(a). *Id.; National Ass'n of Letter Carriers v. United States Postal Serv.,* 590 F.2d 1171, 1174 (D.C.Cir.1978). Thus, decisions under § 301 governing an employee's right to challenge an adverse employment decision

are fully applicable to the case at bar. *McNair,* 768 F.2d at 735; *Lawson v. Truck Drivers, Chauffeurs & Helpers,* 698 F.2d 250, 255–56 (6th Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

Under § 301, if a plaintiff's claims are based, as here, upon the breach of a collective bargaining agreement, he is bound by the terms of the agreement that govern the manner in which an employee's contractual rights may be enforced. *Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967). Before bringing suit, the employee must at least attempt to exhaust the grievance and arbitration procedures established by the bargaining agreement. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 653, 85 S.Ct. 614, 616–17, 13 L.Ed.2d 580 (1965).

When the collective bargaining agreement establishes a mandatory, binding grievance procedure and gives the union the exclusive right to pursue claims on behalf of aggrieved employees, the results obtained by the union are normally conclusive of the employees' rights under the agreement. *See, e.g., Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 568, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976); *Vaca,* 386 U.S. at 185, 87 S.Ct. at 914; *McNair,* 768 F.2d at 735. Therefore, an aggrieved employee whose employment is governed by such an agreement normally lacks standing independently to initiate grievance procedures, to sue for breach of the collective bargaining agreement, or to attack in court the results of the grievance process. *Id.; Acuff v. United Papermakers & Paperworkers,* 404 F.2d 169, 171 (5th Cir. 1968), *cert. denied,* 394 U.S. 987, 89 S.Ct. 1466, 22 L.Ed.2d 762 (1969).

These rules, however, are not without exception. If the union has breached its duty of fair representation by arbitrarily refusing to pursue a claim through the grievance process or by doing so in a perfunctory or otherwise inadequate manner, the aggrieved employee is not foreclosed by the results of the grievance process. *Id.* He may bring a "hybrid" claim suing his employer or his union or both but, in order to

recover, he must prove that: (1) the union breached its duty of fair representation and (2) the employer breached the collective bargaining agreement. *Gutierrez v. United Foods, Inc.*, 11 F.3d 556, 559 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2164, 128 L.Ed.2d 887 (1994); *Daigle v. Gulf State Utils. Co.*, 794 F.2d 974, 977 (5th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986) (citing *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 166, 103 S.Ct. 2281, 2291–92, 76 L.Ed.2d 476 (1983)); *McNair*, 768 F.2d at 735. Such claims are termed "hybrid actions" because they consist of a claim that a union has breached its duty of fair representation coupled with a claim that the employer has violated a collective bargaining agreement. *Thomas v. LTV Corp.*, 39 F.3d 611, 621 (5th Cir.1994) (citing *Reed v. United Transp. Union*, 488 U.S. 319, 328, 109 S.Ct. 621, 627, 102 L.Ed.2d 665 (1989); *DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290–91)).

 Hybrid actions are authorized by § 301(a) of the LMRA and are subject to the six-month statute of limitations established in § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). *Id.* at 621–22 (citing *Daigle*, 794 F.2d at 977). The limitations period for bringing a hybrid action against an employer is six months when, as here, a collective bargaining agreement exists containing exclusive and binding grievance procedures. *Daigle*, 794 F.2d at 976. The limitations period begins to run when the plaintiff knows, or should have known, of the union's alleged breach. *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 412–13 (5th Cir.), *cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990).

 With respect to his breach of contract claim, Suttles alleges in his fifth cause of action:

Defendant intentionally acted to repudiate the collective bargaining agreement; articles 2, 5, 6, 12, 13, 14, 15, 17, 33, 35.

Plaintiff re alleges [sic] all allegation [sic] set forth in his original complaint.

As a result of defendants [sic] breach, plaintiff suffered permanent workplace aggravation of his handicap, substantial emotional distress, and monetary losses.

With regard to his Postal Reorganization Act claim, Suttles alleges in his sixth cause of action, "Defendant intentionally failed to follow its own policies and procedure. Plaintiff, as a result has suffered irreparable damages."

The defendants note in their motion for summary judgment that Suttles' original complaint, filed on October 19, 1994, did not allege a breach of the duty of fair representation or mention any misconduct by the union. The defendants point out that Suttles' amended complaint, filed on November 1, 1995, alleges a breach of the duty of fair representation but does not describe any misconduct by the union that occurred in the previous six months. Thus, according to the defendants, Suttles' hybrid claim should be dismissed as untimely.

At deposition, Suttles remarked that he brought his problems to the attention of his union, but that the union did not file grievances on his behalf. The defendants contend that if Suttles believed that the union should have filed a grievance over the circumstances leading to his resignation on June 5, 1992, Suttles or the union had fourteen days after that date to initiate such a grievance. Attached to Kinsel's declaration is a copy of the agreement between the Postal Service and the American Postal Workers Union ("APWU") and National Association of Letter Carriers ("NARC"). According to Kinsel,

· 4. In Article 15 of the agreement, there exist the exclusive procedures designed to resolve grievances between the Postal Service and NARC or covered employees. Grievances are defined as any "dispute, difference, disagreement or complaint." Article 15 defines a multi-step grievance procedure that culminates in final and binding, third-party arbitration. Both individual employees and the union may initiate grievances at the first step. From that point on, the union and not the employee may appeal grievances which are denied by management.

5. Article 17.4 of the National Agreement provides that employees may file grievance

[sic] and see their union stewards "on the clock" or during work hours, if they receive the permission of their individual supervisor. In many postal installations, the employees request such permission on postal memorandum paper which are known as "forms 13" or "thirteens." A denial of a request to see a union steward or file a grievance while on the clock presents no barrier to filing of grievances. It just means that the employee must do so on his or her own time.

The defendants correctly point out that the union's failure to initiate a grievance should have been apparent to Suttles by June 20, 1992, at the latest. Suttles then would have had six months to file his claim. Suttles, however, did not file his original complaint until October 19, 1994, and his first amended complaint alleging that the union breached its duty of fair representation until November 1, 1995. Thus, Suttles' claims alleging breach of contract and violation of the Postal Reorganization Act are barred by the statute of limitations.

The defendants further submit that Suttles' failure to initiate a grievance over the circumstances surrounding his resignation, which was his right under the collective bargaining agreement, is an additional basis for dismissing his claims. As previously noted, before bringing suit, the employee must at least attempt to exhaust the grievance and arbitration procedures established by the collective bargaining agreement. *Republic Steel Corp.,* 379 U.S. at 653, 85 S.Ct. at 616–17; *Thomas,* 39 F.3d at 621. Here, Suttles did not even attempt to exhaust the grievance and arbitration procedures.

Because Suttles' claims are barred by the six-month statute of limitations and he has failed to exhaust the grievance and arbitration procedures of the collective bargaining agreement, summary judgment on his claims of breach of contract and violation of the Postal Reorganization Act is warranted.

### F. *Other Claims*

The defendants argue in the supplement to their motion for summary judgment that Suttles cited additional statutes in the introductory paragraph of his amended complaint to establish additional, but unnecessary, juris-dictional grounds for his claims of discrimination, constructive discharge, reprisal, and breach of contract. To the extent that Suttles is seeking to allege additional causes of action under any of these statutes, the defendants assert that he has failed to do so with sufficiently clarity to state a claim upon which relief can be granted.

In the introductory paragraph to his amended complaint, Suttles asserts that his action is based on handicap discrimination, reprisal, and constructive discharge. Suttles states that these causes are being brought pursuant to the Civil Rights Act and the Rehabilitation Act; executive order 11478 (in which President Nixon directed federal agencies to establish affirmative action programs); Fed.R.Civ.P. (15) and (18); the Labor Management Relations Act; the Postal Reorganization Act; the collective bargaining agreement between the letter carriers' union and the Postal Service; the Anti–Conspiracy Act; and the Fifth and Fourteenth Amendments to the United States Constitution. Indeed, it appears that Suttles cited multiple bases for jurisdiction based on his claims set forth in the introduction, *i.e.,* "[t]his is an action based on handicap discrimination (asthma) and reprisal (prior eeo activity), constructive discharge without cause, pursuant to. . . ." At the end of the introductory paragraph, Suttles contends that his cause of action is based solely on his handicap. Finally, although Suttles asserted several causes of action in his amended complaint, the additional statutes and Constitutional amendments cited in the introductory paragraph were not delineated as being the bases of additional claims.

Therefore, with respect to the additional statutes and Constitutional amendments cited in the introduction to his amended complaint, Suttles has failed to state a claim upon which relief can be granted.

### IV. *Conclusion*

There exist no outstanding issues of material fact with respect to Suttles' claims of conspiracy, violation of the Rehabilitation Act, retaliation, handicap discrimination, constructive discharge, breach of contract, or violation of the Postal Reorganization Act,

and defendants are entitled to judgment as a matter of law.

To the extent that Suttles seeks relief under any additional theories, he has failed to state a claim upon which relief can be granted.

Therefore, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.