**Jeanne R. HUNT, et al., Plaintiffs,**

v.

**ST. PETER SCHOOL, et al., Defendants.**

No. 96–4322–CV–C–5.

United States District Court,
W.D. Missouri,
Central Division.

April 16, 1997.

Michael H. Finkelstein, Missouri Protection & Advocacy Services, Jefferson City, MO, for Jeanne R. Hunt, Stephanie N. Miller.

Thomas J. Downey, Jefferson City, MO, Rebecca L. McGinnis, Lathrop & Gage, Kansas City, MO, for St. Peter School.

Thomas J. Downey, Jefferson City, MO, Louis C. DeFeo, Jr., Jefferson City, MO, Rebecca L. McGinnis, Lathrop & Gage, Kansas City, MO, for Bishop Michael McAuliffe, Father Don Lammers, Sister Ann Marie Bonvie, Mary E. Budnik.

### MEMORANDUM AND ORDER

LAUGHREY, District Judge.

Plaintiff, Stephanie Miller ("Stephanie"), is an eleven-year-old girl attending the sixth grade at a Jefferson City public school. Her mother, Jeanne Hunt ("Mrs. Hunt"), is also a Plaintiff and is before the Court as her daughter's next friend. This suit was filed after Stephanie was informed that the St. Peter School in Jefferson City ("St. Peter") would no longer be able to provide her with educational services because of her life-threatening asthma which is aggravated by her allergy to scents. Stephanie had attended St. Peter from kindergarten through the fifth grade, except for the three months during her third grade year when she attended the Jefferson City public schools.

St. Peter receives federal funds through Title I and the National School Lunch Program, 42 U.S.C.A. §§ 1751, *et seq.*, and School Breakfast Program, 42 U.S.C.A. § 1771, *et seq.* Because St. Peter receives federal funding, it is subject to Section 504 of the Rehabilitation Act of 1973 which prohibits discrimination because of a disability. Plaintiffs claim that St. Peter violated that Act by failing to provide Stephanie with a scent-free environment to accommodate her disability, asthma, and by excluding her from school because of her disability. Plaintiffs filed a Motion for a Temporary Restraining Order, which I denied. Plaintiffs also moved for a Preliminary and Permanent Injunction. Upon the parties' agreement to consolidate the Motion for Preliminary Injunction and the Trial on the Merits, I held a bench trial on January 28 and 29, 1997, in Jefferson City, Missouri. I now find that Defendants did not violate Section 504 of the Rehabilitation Act of 1973 and the Plaintiffs are not entitled to the relief which they have requested.

### FINDINGS OF FACT

#### A. The School Environment

St. Peter is a private, Catholic school serving students from kindergarten to the eighth grade. It has approximately 500 students, 38 staff members and 52 classrooms. Sixth grade students attend class in four different classrooms each day and attend class or mass in at least six additional rooms each week. Classrooms are not always comprised of the same group of students. St. Peter's administration consists of one principal who is assisted by a part-time secretary. There is no school nurse, but a public health nurse visits the school once a week. St. Peter receives federal funds each year through Title I and the National School Lunch and Breakfast Programs.

St. Peter has a written dress code. Students who violate the code are subject to

various consequences chosen by the principal on a case-by-case basis, St. Peter also has a written policy requiring all visitors to check in at the school office. Not all visitors comply, and the policy is difficult to enforce because of the small administrative staff.

## B. Stephanie's Disability

Stephanie suffers from severe reactive airwaves disease, also known as asthma. Her first hospitalization for the disease occurred on August 10, 1989, She was also hospitalized on September 13, 1990, December 2, 1990, March 20, 1991, and April 8, 1996. Most of the hospitalizations lasted for three to four days and were precipitated by Stephanie's extreme difficulty with breathing. Since her first hospitalization in 1989, Stephanie has been consistently treated for asthma. She takes numerous asthma medications and must constantly monitor her breathing to detect the onset of an asthma attack. Her doctor stated that her asthma is persistent, pervasive, and could be life-threatening. He also stated that its duration is uncertain but could be indefinite, although some people grow out of their allergy and asthma problems. Because of the severity of her asthma, she was evaluated at the National Jewish Hospital in Denver, Colorado, in December 1994, and was tested for allergies which might affect her asthma. According to her primary care physician, exposure to some scents and to some animals triggers Stephanie's asthma.

## C. Accommodation Requested by Jeanne Hunt

On numerous occasions, Mrs. Hunt demanded that Stephanie be provided a mandatory scent-free environment while she attended St. Peter. Mrs. Hunt also demanded that a written contingency plan be developed to address what would happen to Stephanie if her scent-free environment was breached by an interloper. At the time Stephanie requested an accommodation from St. Peter, Mrs. Hunt told the school that Stephanie's asthma was triggered by scents, but she did not provide a physician's report to support this conclusion. Mrs. Hunt initially prevented the school from talking to Stephanie's physician concerning her daughter's medical condition and her special needs. On July 29, 1994, the school received a letter from Mrs. Hunt with an attached letter from Dr. Stricker dated February 10, 1994, addressed "To Whom it May Concern." It said Stephanie "should avoid all reasonable contact with respiratory inhalants such as perfume, strong odors, scents and diesel fumes." Mrs. Hunt wrote to the school officials, in a letter of October 20, 1994: "You may not under any circumstances contact my physician on the phone. Any communication with my physician will be with a medical release from me and in a written format prior to obtaining the release." Mrs. Hunt continued to prevent the school from contacting the doctor to discuss Stephanie's medical condition even though she and Stephanie's doctor continued to send letters to the school. Dr. Schafermeyer wrote a letter dated July 12, 1994, which read, "To Whom It May Concern: Stephanie Miller has a history of severe asthmatic events often precipitated by perfume exposure. It is recommended that she not be exposed to perfumes," Dr. Schafermeyer and Jeanne Hunt sent a letter dated April 15, 1996, which read: "Stephanie Miller is to avoid all perfumes and colognes due to severe asthma. She does require a fragrance-free environment." It was not until August 1996 that school officials had a face-to-face meeting with Stephanie's doctor.

## D. St. Peter's Accommodation of Stephanie

After Mrs. Hunt's request for accommodation, St. Peter implemented a voluntary scent-free classroom for Stephanie. School officials permitted Mrs. Hunt to speak with Stephanie's teachers, classmates and their parents to educate them about Stephanie's condition and to request that they refrain from wearing scents in the classroom. Stephanie's teachers and classmates voluntarily refrained from wearing scents. The parties were only able to identify three times when Stephanie was exposed to people wearing scents in her classroom. On one occasion, a school administrator who was wearing a fragrance left the classroom because of Stephanie's sensitivity to fragrances. On two other occasions, Stephanie was removed from the

classroom and was sent to the library: once, because a substitute computer teacher arrived wearing a fragrance and, once, because a boy in Stephanie's class wore cologne. Stephanie remained in the library for one class period until the substitute computer teacher left her classroom. She remained in the library a full day when her male classmate wore cologne. When Stephanie was sent to the library, the librarian was supposed to give Stephanie help. The librarian, however, was never told what to do with Stephanie. There was another fifth grade classroom where Stephanie could be sent, but Principal Budnik felt this would make a spectacle of Stephanie.

St. Peter's voluntary scent-free policy worked well. Mrs. Hunt never had to pick Stephanie up from St. Peter for an asthma attack during her kindergarten through fifth grade years. Nonetheless, on four different office visits from January 13, 1995, to January 12, 1996, Mrs. Hunt told Dr. Schafermeyer that she had picked Stephanie up from school because Stephanie was suffering from an asthma attack caused by exposures to perfume worn by the children at St. Peter. Those dates were January 13, 1995, October 3, 1995, December 11, 1995, and January 12, 1996. Stephanie, however, was not at school on three of the four days and on the remaining day she did not have to leave school at any time. While enrolled at St. Peter, Stephanie was not precluded from participating in any school events and even participated in the school's volleyball and basketball programs. The parties identified only one incident when another parent complained about the policy. That parent complained because she was not told about Stephanie's problem until the morning of a field trip. Because that parent was wearing a fragrance, she voluntarily agreed not to ride in the bus with her child in order to protect Stephanie, but she complained about the late notice. The parent had taken the day off work especially to be with her daughter and was disappointed that she was not able to accompany her daughter on the bus.

### E. History Behind St. Peter's Termination of Educational Services for Stephanie

Mrs. Hunt persistently requested a mandatory scent-free environment and a written contingency plan in the event interlopers breached the voluntary scent-free environment. St. Peter, however, refused to provide a mandatory scent-free environment. School officials believed it was not possible to enforce a mandatory scent-free environment and they believed a mandatory plan would conflict with the rights of their students and teachers. In a letter dated November 2, 1994, Principal Budnik told Mrs. Hunt that the school would not adopt a mandatory scents-free policy and if their accommodations did not meet Mrs. Hunt's concerns, she should seek another educational setting. After unsuccessful efforts to get more information from Stephanie's doctors concerning her medical condition, the superintendent of St. Peter implemented the school's infectious disease policy. She used this policy because it was already in place and because it provided for a team of professionals to consider appropriate responses to Stephanie's needs. Mrs. Hunt was upset by the use of the infectious disease policy because it could stigmatize her daughter. Mrs. Hunt finally agreed, however, to meet with school officials and Stephanie's doctor. That meeting occurred on August 2, 1996, and Mrs. Hunt, Principal Budnik and Stephanie's doctor, Dr. Schafermeyer, were present. At that time, Dr. Schafermeyer told Principal Budnik that Stephanie had life-threatening asthma and that she required a mandatory scent-free classroom.[1] After this meeting, Principal Budnik, Father Lammers, and Superintendent Bonvie, met and concluded that they would not and could not provide a mandatory scent-free environment at St. Peter.

---

1. Dr. Schafermeyer stated in his deposition that after seeing Stephanie in the hospital in April of 1996, he was "convinced that this child could die from this if this issue was not aggressively controlled." (Dep. at 49.) He recommended that children with life-threatening asthma should "have a full guarantee of a requirement of a school policy," (Dep. at 62.) He also said "it only takes one event to have a child in severe status asthmaticus die.... She has just had too many documented severe events of life-threatening status asthmaticus and asthma." (Dep. at 63.)

Because Dr. Schaferneyer had announced that such an environment was needed to maintain Stephanie's life, they notified Mrs. Hunt that Stephanie would no longer be able to attend St. Peter. In the August 15, 1996, letter they said: "We regret to inform you St. Peter is unable to provide the resources you deem necessary for Stephanie's continued good health. We will, therefore, no longer be able to provide educational services for Stephanie at St. Peter School." The letter was written because Defendants could not provide a safe environment for Stephanie according to the requirements established by Stephanie's doctor. Mrs. Hunt never requested that Stephanie be allowed to attend St. Peter under the voluntary scent-free policy. Instead, Mrs. Hunt filed a lawsuit requesting a mandatory scent-free environment. Likewise, the school never gave Stephanie an opportunity to remain in school with the voluntary scent-free policy.

## CONCLUSIONS OF LAW

Section 504 of the Rehabilitation Act of 1973 prohibits a federally-funded program from discriminating against a disabled individual solely by reason of that person's disability. This case presents the question of whether the Rehabilitation Act has been violated when a private religious school refuses to provide a scent-free environment for a student who suffers from severe asthma and then excludes the student because her condition exposes the student to an unreasonable degree of risk in the school environment. Plaintiffs seek a permanent injunction against the school prohibiting them from excluding Stephanie because of her asthma and requiring them to provide her with a scent-free environment and a written contingency plan in the event her scent-free environment is violated. While it is unclear from her complaint, Plaintiffs also alleged at trial a claim for retaliation under the Rehabilitation Act. Recognizing that retaliation claims are cognizable under the Rehabilitation Act, *Hoyt v. St. Mary's Rehabilitation Ctr.*, 711 F.2d 864, 867 (8th Cir.1983), I will address this claim as well as the claim for discrimination.

### A. Rehabilitation Act

In order to recover under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Rehabilitation Act"), Plaintiffs must show that: (1) St. Peter receives federal financial assistance; (2) Stephanie is a handicapped individual; (3) Stephanie is otherwise qualified for participation in the program; and (4) Stephanie was denied benefits or was subject to discrimination under the program solely because of her handicap. *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1380 (3d Cir.1991). To determine whether these requirements have been proven, the Court may look to the regulations promulgated by the executive branch to interpret Section 504 of the Rehabilitation Act, *School Bd. of Nassau Count. Fla. v. Arline*, 480 U.S. 273, 279, 107 S.Ct. 1123, 1126-27, 94 L.Ed.2d 307 (1987), *reh'g denied*, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987). In this case, the regulations of the Department of Education and Agriculture apply because St. Peter receives federal funds from the Department of Education through Title I and Department of Agriculture funds through the National School Lunch and School Breakfast Programs. *See generally* 34 C.F.R. § 104 July 1 (1996) and 7 C.F.R. § 15(b) Jan. 1 (1996).

### 1. Does St. Peter Receive Federal Financial Assistance?

All parties agree that St. Peter received federal financial assistance from the Department of Agriculture's National School Lunch and Breakfast Programs and from the Department of Education's Title I program. These funds were received during the periods relevant to Plaintiffs' claim. St. Peter, therefore, must comply with the Rehabilitation Act.

### 2. Is Stephanie a Handicapped Individual?

A handicapped individual is defined by the Rehabilitation Act as a person who has: (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of such impairment; or (3) is regarded as having such impairment. 29 U.S.C. § 706(8)(B). *Also see,* 7 C.F.R. § 15b.3(1) (Department of Education regula-

tions); 34 C.F.R. § 104.3(j) (Department of Agriculture regulations). Plaintiffs need establish only one of the three definitions to show that Stephanie is a handicapped individual.

■ A physical impairment includes a condition which affects a person's respiratory system, 7 C.F.R. § 15b.3(j); 34 C.F.R. § 104.3(j)(2)(I)(A). Both Jeanne Hunt and Stephanie's doctor testified that Stephanie suffers from severe asthma, which is a physical impairment. In addition, the regulations define major life activities to include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, *breathing*, learning and working. 7 C.F.R. § 15b.3(k); 34 C.F.R. § 104.3(j)(2)(ii) (emphasis added). Stephanie's asthma substantially limits her ability to breathe. She has been hospitalized repeatedly due to the severity of her attacks and must continually take medication and treatments for her condition. Her doctor identifies her illness as life-threatening.

Defendants point to several cases in which an asthmatic plaintiff did not satisfy the Rehabilitation Act definition of a "handicapped individual." *Suttles v. United States Postal Service*, 927 F.Supp. 990, 1004–05 (S.D.Tex.1996) (mail carrier was not handicapped because he did "not suffer a substantial limitation of major life activity" even though asthma attacks regularly sent him to the emergency room); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718 (2d Cir., 1994)(asthmatic administrator was not handicapped because she could work elsewhere in the hospital); *Emery v. Caravan of Dreams, Inc.*, 879 F.Supp. 640 (N.D.Tex. 1995)(an asthmatic plaintiff who was allergic to tobacco, pollen, mites, etc., was not handicapped because she had worked for 29 years and was physically active). All of these cases arose in the employment context and focused on the major life activity of "working." Stephanie's claim arises in an educational setting and focuses on the major life activity of "breathing." The Rehabilitation Act only requires evidence of one major life activity being impaired. Even if the Defendants are correct that Stephanie's education was not substantially impaired by

her asthma, her breathing was impaired. More important, the United States Supreme Court has already addressed this issue in a factually analogous case. In *Arline*, the Supreme Court found that a teacher who had tuberculosis was a "handicapped individual" within the meaning of the Rehabilitation Act. The Court reached this conclusion based on two pieces of evidence. First, a doctor testified that Arline had an acute form of tuberculosis which affected her respiratory system. *Id.* at 280–81, 107 S.Ct. at 1127–28. The Court said this constituted a "physical impairment." *Id.* at 281, 107 S.Ct. at 1127–28. Second, Arline's condition required hospitalization in 1957, "a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." *Id.* If Arline was a handicapped individual, Stephanie is as well. The only medical evidence presented to me at trial was from Stephanie's doctors who said her asthma substantially interfered with her breathing and that her asthma was triggered by scents. Furthermore, Stephanie has been hospitalized on several occasions for her asthma. I find that Stephanie is a "handicapped individual."

■ In addition, Stephanie has been regarded as having an impairment. A person is regarded as having an impairment if that person is treated as having an impairment which substantially limits the person's major life activities. *Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir.1996); 7 C.F.R. § 15b.3(m); 34 C.F.R. § 104.30(2)(iv). School officials asked its teachers to comply with the voluntary scent-free program, allowed Jeanne Hunt to educate other parents and students, and arranged for annual meetings between Hunt and Stephanie's classroom teachers. St. Peter also excluded Stephanie from its educational program because she has a life-threatening illness that they were unable and unwilling to accommodate. It is clear they regarded Stephanie as having an impairment within the meaning of the Rehabilitation Act.

### 3. Is Stephanie Otherwise Qualified? [2]

■ The general rule is that "[a]n otherwise qualified person is one who is able to

---

2. Section 504 of the Rehabilitation Act of 1973   uses the term "otherwise qualified." In the De-

meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979),

The term is specifically defined by the applicable regulations in the context in which the dispute arises. There are four categories: (1) employment; (2) public pre-school, elementary, secondary or adult educational services; (3) post-secondary and vocational educational services; and (4) all other services covered by the Rehabilitation Act. 7 C.F.R. § 15b.3(n); 34 C.F.R. § 104.3(k). Because Stephanie's school is neither an employment program, a public school program, nor a post-secondary or vocational program, the last, catchall category is the only one that can apply. That regulation provides that a qualified handicapped individual is a "handicapped person who meets the essential eligibility requirements for receipt of such services." 7 C.F.R. § 15b.3(n)(4); 34 C.F.R. § 104.3(k)(4). Whether or not Stephanie meets the essential requirements of St. Peter requires a two-step analysis. First, I must look at whether she is qualified in spite of her disability. If not, then I must determine whether she could be qualified if an accommodation is made. *Arline*, 480 U.S. at 288, 107 S.Ct. at 1131. In other words, the mandate to provide accommodation is necessarily related to the question of whether a disabled person is qualified to participate. A handicapped person is qualified if his or her disability can be reasonably accommodated. *Kohl by Kohl v. Woodhaven Learning Ctr.*, 865 F.2d 930, 936 (8th Cir.1989), *cert. denied*, 493 U.S. 892, 110 S.Ct. 239, 107 L.Ed.2d 189 (1989). A handicapped person is not qualified if he or she cannot succeed with the disability despite all appropriate accommodations. *Murphy v. Franklin Pierce Law Ctr.*, 882 F.Supp. 1176, 1182 (D.N.H.1994), *aff'd*, 56 F.3d 59 (1st Cir. 1995). By her own doctor's admission, Stephanie is at risk of death unless she has a scent-free environment. Absent accommodation, she is not qualified to attend St. Peter. The school has no obligation to continue to provide services to a student who is exposed to an unreasonable risk of danger in the school environment. *Chiari v. City of League City*, 920 F.2d 311, 317 (5th Cir.1991)(employee posed unreasonable risk of hurting himself or others on the job); *Doe v. New York Univ.*, 666 F.2d 761, 777 (2d Cir.1981) (medical student posed significant risk of suffering a recurring mental disorder). In *Knapp v. Northwestern Univ.*, 101 F.3d 473, 483 (7th Cir.1996), the school found Knapp ineligible to play basketball because of his heart defect, and Knapp brought suit against the school claiming that this action violated the Rehabilitation Act. The court stated that a significant risk of injury can disqualify a person if the risk cannot be eliminated. It further held that the school, not the court, should decide whether there is a significant risk of injury "as long as [the decision is] made with reason and rationality and with full regard to possible and reasonable accommodations." *Id.* at 484. The court warned that the school's decision should be carefully scrutinized "to make sure that the decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury." *Id.* Northwestern University had relied on its own doctors whose opinions conflicted with the experts hired by the plaintiff. Nonetheless, the court held that the inquiry was reasonable and the decision was for the school to make. *Id.* at 485.

In this case, St. Peter did not exclude Stephanie until Stephanie's own doctor said her life was at risk if she did not have a scent-free environment. The school was certainly justified in relying on the Plaintiffs' own expert and was not required to gather any further advice. The remaining question then is whether St. Peter was required to provide Stephanie with the requested accommodation, a mandatory scent-free environment.

---

partment of Education regulations the term qualified is used. These terms are intended by the drafters of the regulations to be interchangeable. The drafters wanted to make it clear that a qualified handicapped person is one who can meet all of the essential functions of a job or a program with or without reasonable accommodation. Appendix A to Part 104(A)(5).

■ While reasonable accommodation was the standard applicable in the foregoing cases, reasonable accommodation is not the standard applicable to St. Peter. The regulations of both the Department of Education and the Department of Agriculture contain a section dealing specifically with the accommodation required in private educational programs. Those programs are only required to make a minor adjustment, not a reasonable accommodation. While I have been unable to identify a case interpreting minor adjustment, it is clear that minor adjustment is less than a reasonable accommodation. Minor indicates a minimal burden and adjustment implies a small correction.

To decide whether St. Peter provided Stephanie with an appropriate adjustment, I must consider the burden to the institution and the benefit to the individual. *Vande Zande v. State of Wis. Dep't. of Admin.*, 44 F.3d 538 (7th Cir.1995).[3] St. Peter provided a voluntary scent-free environment on a year-by-year basis. All parties agreed that this program had worked well. Nonetheless, Mrs. Hunt continued to press for a mandatory policy because she feared that problems would arise in the future. In addition, Mrs. Hunt did not want the continuing responsibility of educating Stephanie's teachers, classmates, and their parents about her medical problems. She wanted the school to take responsibility for maintaining a mandatory scent-free environment. I find that the school did not have that responsibility under the Rehabilitation Act and that the voluntary scent-free classroom, which it did provide, more than met the definition of a minor adjustment.

■ First, the benefit of a mandatory policy would be minimal given that the voluntary policy was working effectively. In *Suttles v. United States Postal Service*, 927 F.Supp. 990 (S.D.Texas 1996), an employer was not required to transfer its asthmatic employee to a different position because the transfer would not provide appreciably better protection than the accommodation already provided. Second, a mandatory policy would be burdensome, indeed unworkable. St. Peter has an unusually small administrative staff, one principal and a part-time secretary for nearly 500 students in eight grades. It does not have a full-time nurse but relies upon a public health nurse who comes occasionally. It has multiple classrooms, a gymnasium, and a church, which all members of the school regularly attend. It would be unreasonable to require the school to enforce a scent-free policy under these circumstances.

That task would be especially onerous because Stephanie attended several different classrooms as well as the gymnasium and the church. Plaintiffs argue, however, that Mrs. Hunt only wanted a scent-free classroom, not a scent-free school. While that was Mrs. Hunt's position at trial, I find that her earlier requests were for a scent-free environment including all areas of the school that Stephanie entered. Furthermore, it would make no sense to have a policy which protected only one of those classrooms, while regularly exposing Stephanie to scents elsewhere in the building. There is no basis in the record from which I can conclude that Stephanie's disability could be accommodated with a scent-free policy which only covered her classroom.

Plaintiffs also argue that the burden of a mandatory policy would not be great because the voluntary policy had not been a problem for the school. Plaintiffs suggest that they are merely asking the school to assume the responsibilities that had been assumed by Mrs. Hunt. A mandatory policy, however, goes far beyond educating parents, students and teachers about Stephanie's allergies. Plaintiffs fail to recognize that a voluntary policy gives the school substantial flexibility and continued control over the management of their program. If the policy becomes mandatory, the school must enforce it or risk leading students and staff to conclude that compliance with the rules is not really required. Schools, like courts, are at risk of undermining the credibility of the institution when they make orders that can-

---

3. While this case interpreted the American with Disabilities Act and not the Rehabilitation Act of 1973, courts have held that cases under the ADA are instructive in addressing claims under the Rehabilitation Act. *Wooten v. Farmland Foods,* 58 F.3d at 385 n. 2 (8th Cir.1995).

not be enforced. Plaintiffs also fail to recognize that a mandatory rule is often resisted more vigorously than a voluntary policy. In a society inclined to protect rights rather than acknowledge responsibility, a confrontation is more likely to occur when a student or parent is told that they cannot wear scents than when they are educated and given the freedom to be thoughtful to a classmate. Indeed, as students mature and enter adolescence, their interest in scents grow geometrically, making it increasingly difficult to maintain a voluntary or a mandatory scent-free environment.

Plaintiffs attempt to minimize the foregoing concerns by pointing to the dress code policy at St. Peter, and they suggest that it would be a simple matter to add scents to the things which the students could not wear. The fallacy in the argument is that a violation of the dress code is quickly apparent. Scents are more personal and would require a closer inspection than would be comfortable for either the administrator or the interloper. Sniffing may be appropriate in the wild kingdom but not in an elementary school. A scent-free environment would also affect students, staff, parents and visitors, while the dress code only regulates the conduct of students. Finally, scents come from numerous sources, not just from people. There are scents in deodorants, shampoos, hair conditioners, perfumes, laundry detergent, hair spray, makeup and breath fresheners. There are also scents in cleaning supplies, food, markers, paste, paint, even church candles and incense burners. The variety of products producing scents, the number of people who would be affected by a mandatory policy, and the personal nature of inspection to detect violations, all make a scent-free environment substantially more burdensome to enforce than a dress code. The burden of such a mandatory policy is best illustrated by Mrs. Hunt's own response when confronted with irritants outside the school. On Easter weekend in 1996, Stephanie played in houses where dogs and cats were present. Mrs. Hunt did not require those dogs or cats to be removed, nor did she forbid Stephanie to play where she would be exposed to irritants. Likewise, on that same weekend, Mrs. Hunt did not require her relatives to leave a family gathering because some of them were wearing scents. Instead, Stephanie played in the basement while the adults remained upstairs.

■■■ A mandatory policy also limits the choices of the non-disabled population at St. Peter. In an employment setting, courts have found that "[a]n employer is not required to make accommodations that would violate the rights of other employees." *Wooten,* 58 F.3d at 386 (citing *Mason v. Frank,* 32 F.3d 315, 319 (8th Cir.1994)). Courts have been unwilling to require an employer to provide a smoke-free environment for its employees, although there is even less justification for smoking than there is for scented products. *Emery v. Caravan of Dreams. Inc.,* 879 F.Supp. 640 (N.D.Tex.1995); *Harmer v. Virginia Elec. & Power Co.,* 831 F.Supp. 1300 (E.D.Va.1993); *Vickers v. Veterans Admin.,* 549 F.Supp. 85 (W.D.Wash. 1982) (no duty to provide a mandatory smoke-free environment after employer had secured voluntary compliance by the workers in the area). The purpose of the Rehabilitation Act of 1973 is to prevent discrimination against disabled persons and, if necessary, to add things to the environment to permit greater participation by the disabled—elevators, bathrooms, signs, more time on examinations for the learning disabled, flexible work schedules for the mentally ill, etc. There is nothing in the Act to suggest that the non-disabled population was expected to give up or substantially alter their lifestyle. There is nothing in the Act to suggest that Congress intended the non-disabled population at St. Peter to stop wearing scented products so that one child could avoid the possibility of an allergic reaction. If Congress did so intend, it will have to say so with greater clarity given the revolutionary quality of such a policy.

I, therefore, find that St. Peter more than satisfied the minor adjustment standard when it provided a voluntary scent-free environment and permitted Mrs. Hunt to do extensive education and monitoring in Stephanie's classroom. The plan worked well and credit goes to the compassion of the children and teachers in Stephanie's classroom who worked so hard to provide a healthy environment for this little girl.

I also find that the school was not required to provide a written contingency plan in the event Stephanie was exposed to scents. Teachers and principals, particularly in a religious institution, must decide how to best educate children, academically, emotionally, and ethically. In a school environment involving so many children, disparate learning places, and constant activity, it is important for the teacher or school administrator to decide how to resolve conflict in the school community. Plaintiffs say that these administrators made decisions based more on a whim than on principle, but I disagree. In the three instances when Stephanie was exposed to scents, Principal Budnik made reasonable choices. I have already concluded that the non-disabled population does not have to refrain from wearing perfume because another student is allergic to it. A corollary would be that they do not have to be removed from the class because they are wearing perfume. Stephanie was provided a protected environment for her health outside the classroom while scents were present in her classroom. The disruption to her schedule was de minimis and there is insufficient evidence to support the Plaintiffs' allegation that a more appropriate placement would be in another fifth grade class. It would have been better for the school to ensure that the librarian had adequate instruction concerning Stephanie's educational objectives for the day, but failure to so inform the librarian does not even approach a violation of the Rehabilitation Act. Mrs. Hunt is also in a poor position to complain about the details of the accommodation made by St. Peter. School officials on several occasions tried to communicate with Stephanie's doctor to get more information about needed accommodations, but were repeatedly rebuffed by Mrs. Hunt. In seeking accommodation, Mrs. Hunt was increasingly confrontational and uncooperative, and even attempted to use the media to intimidate the school. This is not the kind of good faith negotiation contemplated by the Rehabilitation Act.

## B. Retaliation Claim

While Plaintiffs did not clearly state a claim for retaliation in their complaint, they did attempt to raise the issue at trial. In the interest of closure, I will address that issue as well. Plaintiffs carry the initial burden of establishing their prima facie case for retaliation by showing: 1) participation in a protected activity; 2) subsequent adverse action; and 3) evidence of a causal connection between the protected activity and the subsequent adverse action. *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987) (Title VII case). The burden then shifts to defendants to provide a nondiscriminatory reason for the action. *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir.1994). Upon this showing, the burden shifts back to Plaintiffs to demonstrate that the proffered reason is pretextual. *Id.* Plaintiffs assert that when Mrs. Hunt made a request for accommodation, she was engaged in a protected activity and that the reason that Stephanie was excluded from school was because Mrs. Hunt was a strong advocate for her child. They point to the timing of the expulsion which came only two weeks after the meeting with Stephanie's doctor who informed the school that Stephanie required a scent-free environment. They also point to the letter of expulsion which said that the school could not provide educational services because it lacked the resources to make the accommodation that Mrs. Hunt "deemed necessary." Principal Budnik did say that there was "no special reason" for expelling Stephanie instead of permitting her to remain in school with the voluntary scent-free classroom, so Plaintiffs may have established a prima facia case. The burden then shifted to Defendants to offer a legitimate, nondiscriminatory reason for their action. *Reich*, 32 F.3d at 365. They did so by explaining that the school was concerned about Stephanie's health and their realistic assessment of their ability to provide a mandatory scent-free environment. Plaintiffs have not shown that the school's offered reason was pretextual and, indeed, there is no evidence of actual discriminatory animus.

## CONCLUSION

This dispute was a battle of wills between St. Peter and Mrs. Hunt. Unfortunately, Stephanie has had to pay the price. While I find that St. Peter is not guilty of discrimination or retaliation, that conclusion is based on

the unchallenged medical evidence contained in the record that shows Stephanie's life is at risk if she is exposed to scents. Even though I observed what appeared to be a healthy child in the courtroom and have heard evidence that Stephanie never suffered an asthma attack at school which was triggered by scents, I defer to the medical evidence. Due to the tendency of asthmatic conditions to change over time, if it is later determined by an adequate professional examination that Stephanie's condition is not life-threatening, then Stephanie would be "otherwise qualified" to attend St. Peter. Because I find that Plaintiffs are not entitled to succeed on the merits, it is not necessary to consider the remaining factors outlined in *Dataphase:* 1) threat of irreparable harm to plaintiffs; 2) the balance between plaintiff's threatened harm and the harm to be suffered by the nonmoving party if plaintiffs prevail; and 3) whether the injunction would promote the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981)(en banc). It is therefore

ORDERED that Plaintiffs' Request for a Preliminary and Permanent Injunction (Doc. # 19) is DENIED and judgment is entered on all counts for Defendants.