ALEX G., a minor, by and through DR.
STEVEN G., his Guardian Ad Litem;
Dr. Stephen G.; and Helen G., Plain-
tiffs,

v.

BOARD OF TRUSTEES OF DAVIS
JOINT UNIFIED SCHOOL DIS-
TRICT et al., Defendants.

No. CIV–S–03–2258 DFLCMK.

United States District Court,
E.D. California.

Aug. 19, 2005.

Bob N. Varma, Varma & Clancy, Elk Grove, CA, for plaintiffs.

Gregory A. Wedner, Lozano Smith, San Rafael, CA, for defendants.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

Plaintiff Alex G. ("Alex") is an elementary school student who is eligible for special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. He and his parents, Dr. Stephen G. and Helen G., assert several claims against the Davis Joint Unified School District (the "District"), the District's board of trustees (the "Board"), and a number of its administrators and educators. Defendants move for summary judgment on plaintiffs' discrimination and retaliation claims under § 504 of the Rehabilitation Act of 1973 (" § 504"), 29 U.S.C. § 794. The motion is GRANTED.

## I.

Alex is a third-grader with autism. (Defs.' SUF ¶ 6.) In August 2001, Alex's family moved to Davis and enrolled Alex in the first grade in the District for the 2001–02 school year. (Id.; Wedner Decl. Ex. A at 4.) In accordance with Alex's individualized education plan ("IEP") from the transferring school district, the District placed Alex in a regular education class-room at Valley Oak Elementary School ("Valley Oak") with support services. (Mot. at 2.) In addition, the District developed a behavior intervention plan ("BIP") to address Alex's history of aggressive outbursts and violent tendencies. (Defs.' SUF ¶ 9.)

As part of Alex's BIP, the District established an emergency plan that allowed the use of physical restraints when necessary to protect other students or staff from physical harm. (Id.) Alex's parents initially consented to implementation of the BIP and the use of physical restraints. (Id. ¶ 8.) However, in June 2002, just prior to Alex starting the second grade, Alex's parents withdrew their consent. (Id.)

Alex's behavior problems continued in the second grade. On the first day of school, Alex had a serious behavior incident that resulted in a three-day suspension.[1] (Id. ¶ 29.) Alex had two more serious behavior incidents in October 2002, during the first week he returned to school.[2] (Id. ¶ 12.) During these incidents, two of Alex's special education assistants—defendant paraeducator Robert Arosteguy ("Arosteguy") and defendant special education teacher Michael Inchausti ("Inchausti")—used emergency physical restraints to bring Alex under control.[3] (Id.) Inchausti and Arosteguy used the physical restraints in accordance

---

1. During this "serious behavior incident," Alex assaulted and injured four staff members. (Wedner Decl. Ex. A at 4 n. 3.) Alex was taken to a resource room, where the staff put themselves in the four corners of the room. (Id.) All furniture was slowly removed so Alex could not throw or destroy the furniture. (Id.) Eventually, Alex wore himself out. (Id.)

2. Because of continuing disagreements between the District and Alex's parents, Alex did not return to school until October. (Mot. at 3.) During these incidents in early October, Alex was jumping across wet tabletops. Defendants restrained him, they contend, because they believed his actions posed a serious danger to his own safety. (Wedner Decl. Ex. X at 12.)

3. Arosteguy and Inchausti used "wall restraints" on these occasions. (Wedner Decl. Ex. X at 13.) Based upon a description provided at the hearing on this matter, wall restraints involve pinning the child up against a wall until he calmed down.

with the District's plan for emergency interventions. (*Id.* ¶ 14.)

On December 4, 2002, Alex's parents requested a due process hearing to resolve their continuing dispute with the District over Alex's special education services and his placement for the 2001–02 and 2002–03 school years. (*Id.* ¶ 32.) While this dispute was ongoing, Alex had another serious behavior incident involving his teacher, defendant Penelope Dwyer ("Dwyer"), and another student, resulting in another three-day suspension.[4] (Wedner Decl. Ex. A.) Alex's parents decided to keep Alex out of school until they resolved their disputes with the District. (*Id.*)

The District and Alex's parents entered into a settlement agreement on January 31, 2003. (Defs.' SUF ¶ 33.) The settlement agreement covered the provision of special education services for the 2001–02 and 2002–03 school years. (Wedner Decl. Ex. H.) As part of the agreement, the District agreed to: (1) contract with an outside organization, Bridges, to conduct a functional analysis assessment and develop a behavior intervention plan for Alex within the school setting; and (2) conduct a comprehensive academic assessment of Alex. (*Id.*) In return, Alex's parents released all claims under the IDEA up to the date of the settlement agreement. (*Id.*)

When Alex returned to school on February 19, 2003, his disruptive behavior continued to escalate. He was unable to remain in the classroom for more than ten minutes at a time and spent the majority of his day outside with one or two of his aides. (*Id.* Ex. A at 5.) His behavior included kicking, screaming, yelling, spitting, biting, and throwing objects. (*Id.*) Additionally, Alex pulled the school's fire alarms on five separate occasions during the early weeks of March. (*Id.*) The Bridges staff advised the District that the best way to handle Alex's maladaptive behavior, including the pulling of the fire alarms, was to ignore it and deny him the reaction he was seeking. (*Id.*) The District made efforts to implement this strategy, but at least some teachers continued to reprimand Alex for pulling fire alarms. (Pls.' SUF ¶ 78.)

Alex's disruptive tendencies put a strain on Dwyer, who was his regular classroom teacher. (*Id.* ¶ 80.) She started receiving counseling for anxiety and began keeping a log of daily events regarding Alex after his return to school in February 2003. (*Id.* ¶ 85.) At some point during February or March, Dwyer informed the District's special education coordinator, defendant Laurel Clumpner ("Clumpner"), of her issues with Alex and her concerns about her and other students' safety. (*Id.* ¶ 79.) She also sought the assistance of her teacher's union. (*Id.* ¶ 86.) The District did not inform Alex's parents of Dwyer's anxiety. (Opp'n at 4–5.)

On March 19, 2003, an IEP meeting was held to discuss the functional analysis assessment, the proposed behavior intervention plan from Bridges, and the District's academic assessments of Alex. (*Id.*) During the IEP meeting, the Bridges staff discussed the idea of implementing a "whole class reinforcement" system in Dwyer's classroom. (*Id.*) The proposed "whole class reinforcement" system involved giving the class some sort of tangible reward, such as putting a marble in a jar, when the majority of the class performed a task well. (Varma Decl. Ex. 3 at 25.) However, Bridges had not yet completed the functional analysis assessment and the

---

4. During this incident, Alex punched his teacher in the stomach twice and kicked an- other student in the head. (*Id.*)

parties could not agree on Alex's IEP, so they scheduled another meeting for a week later. (*Id.*)

During the week between the March 19th and March 26th IEP meetings, Dwyer developed her own classroom program, called "Penny's Proud" and "Grant thinks I'm great." (Defs.' SUF ¶ 38.) Her program involved giving students a small piece of paper with a happy graphic on it when they exhibited positive behavior choices. (Wedner Decl. Ex. Z at 278–79.) During the March 26th IEP meeting, Bridges told the IEP team that Dwyer's program was insufficient to meet Alex's needs and made some alternative suggestions. (*Id.* Ex. A. at 6.) The IEP meeting concluded without the parties reaching an agreement on this issue or on Alex's goals and objectives for his IEP plan. (*Id.*) However, the District did agree to have its staff undergo further training in Bridges' behavior modification methodologies. (SUF ¶ 40.) That training was held on April 4, 2003. (*Id.*)

In late March 2003, the principal of Valley Oak, defendant Consuelo Coughran ("Coughran"), contacted the District's superintendent, defendant David Murphy ("Murphy"), about Alex's escalating behavior and the five fire alarm incidents. (*Id.* ¶ 22.) Murphy directed his staff to investigate the District's legal options. (Mot. at 4.) While the District was considering its options, Alex's parents wrote a letter to Murphy and the Board in which they complained that the District had not complied with the settlement agreement. (Defs.' SUF ¶ 28.) Alex's parents received no response from the District. (Opp'n at 4.)

On April 18, 2003, following several conversations with its legal counsel, the District filed a request for a temporary restraining order ("TRO") against Alex in the Yolo County Superior Court. (Wedner Decl. Ex. H.) The District sought to have Alex transferred to Patwin Behavior Learning Center ("Patwin"), a public school within the District for children with behavior difficulties. (*Id.*) The court granted the TRO that day, ordering Alex to attend Patwin. (*Id.*) However, two months later, following a preliminary injunction hearing, the court modified its ruling. (Varma Decl. Ex. 8.) While the court prohibited Alex from returning to Valley Oak prior to August 31, 2003, it refused to issue any orders regarding Alex's educational placement and vacated the portion of the TRO ordering Alex to attend Patwin. (*Id.*) Instead, the court directed the District's special hearing office to exercise its discretion under applicable authority to address Alex's placement. (*Id.*)

On April 21, 2003, Alex's parents requested another administrative due process hearing before a hearing officer, challenging, among other things, the District's implementation of the settlement agreement. (Defs.' SUF ¶ 43.) The hearing took place on July 31, 2003. (*Id.* ¶ 45.) The hearing officer issued a written decision shortly thereafter, finding in favor of the District on some issues and in favor of Alex on other issues. (*Id.*)

Plaintiffs filed this first amended complaint on December 24, 2003, bringing claims under the IDEA, § 504, 42 U.S.C. § 1983, and state law against the District, the Board, and numerous administrators and educators in the District (the "individual defendants"). Following the court's July 30, 2004 order, the only remaining claims are: (1) under the IDEA, a challenge to certain portions of the Hearing Office's decision; (2) a discrimination claim under § 504 against the District, the Board, and the individual defendants; and (3) a retaliation claim under § 504, also brought against the District, the Board, and the individual defendants. Defen-

dants move for summary judgment on the discrimination and retaliation claims only.

## II.

### A. § 504 Discrimination Claim

■■■ To establish a prima facie case of discrimination under § 504, plaintiffs must show that: (1) Alex is disabled; (2) he is otherwise qualified to participate in the District's program; (3) he has been subject to discrimination by defendants solely because of his disability; and (4) defendants are recipients of federal funding. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 (9th Cir.1999). Additionally, plaintiffs bringing § 504 claims in the special education context must show that the educational decisions relating to the student were so inappropriate as to constitute either bad faith or gross misjudgment. *See, e.g., N.L. v. Knox County Schs.*, 315 F.3d 688, 695–96 (6th Cir.2003); *Sellers v. Sch. Bd.*, 141 F.3d 524, 529 (4th Cir.1998); *Monahan v. Nebraska*, 687 F.2d 1164, 1170–71 (8th Cir.1982); *Reid v. Petaluma Joint Union High Sch. Dist.*, 2000 WL 1229059, at *3 (N.D.Cal.2000). In support of this requirement, courts have explained that:

> [t]he language of the statute is instructive. It prohibits exclusion, denial of benefits, and discrimination 'solely by reason of ... handicap.' Manifestly, in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide the 'free appropriate education' ... must be shown.... We do not read § 504 as creating a general tort liability for educational malpractice, especially since the Supreme Court ... has warned against a court's substitution of its own judgment for educational decisions made by state officials. We think, rather, that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least

in the context of education of handicapped children.

*Monahan*, 687 F.2d at 1170–71. Thus, the establishment of an IDEA violation is a necessary, but not sufficient, component of plaintiffs' § 504 claim.

■■■ Finally, a plaintiff seeking monetary damages under § 504 must prove that defendants acted with deliberate indifference. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir.2001). Deliberate indifference is similar to the bad faith or gross misjudgment standard, requiring "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 1139.

■■■ Defendants contend that, even if plaintiffs make a sufficient showing of an IDEA violation, they fail to show that defendants acted with bad faith, gross misjudgment, or deliberate indifference. (Mot. at 19–30.) In response, plaintiffs assert that the totality of events reveals a pattern of defendants repeatedly punishing Alex for behaviors that are part of his disability and sabotaging his education program to justify removing him from the regular classroom setting. (Opp'n at 7.) This pattern began, they assert, when Alex's parents withdrew their consent to physical restraints, and it escalated until defendants succeeded in removing Alex from Valley Oak by means of the TRO. (*Id.*)

Plaintiffs' characterization of the evidence is not reasonable and could not be accepted by a reasonable factfinder. The actions/omissions plaintiffs identify, whether taken as a whole or looked at individually, do not suggest bad faith, gross misjudgment, or deliberate indifference on the part of the District. First, plaintiffs allege that defendants wrongfully used physical restraints on Alex on two occasions in Oc-

tober 2002, despite the explicit withdrawal of consent to such restraints by Alex's parents in June 2002. (*Id.*) These actions demonstrate bad faith or gross misjudgment, they contend, because the withdrawal of consent was explicit, and there could have been no confusion on this issue.[5] (*Id.*)

As an initial matter, it is unclear that the Districts' actions violated any law, given that state law explicitly allows school officials to physically restrain students when the student poses an immediate danger to himself or others. Cal.Code. Regs. tit.5, § 3052(I). Here, Alex was restrained because he was jumping across wet tabletops. The teachers could reasonably have determined that Alex posed an immediate physical danger to himself. Moreover, Inchausti and Arosteguy used physical restraints approved by the District as part of the District's emergency intervention plan.[6]

Furthermore, even if the use of physical restraints did violate the IDEA, there is no evidence that defendants acted with bad faith, gross misjudgment, or deliberate indifference in doing so. Rather, the evidence suggests that the teachers believed they were acting within their discretion to protect Alex from imminent harm to himself. In fact, Inchausti and Arosteguy have both stated that they believed that Alex's prior BIP, which allowed physical restraints, was still in effect in October 2002. (Defs.' SUF ¶ 15.) Alex has presented no evidence calling into question their good-faith belief. Accordingly, plain-

tiffs' argument regarding the physical restraints is unpersuasive.

■ Second, plaintiffs argue that Dwyer's behavior towards Alex upon his return to her classroom in February 2003 is further evidence of this alleged pattern of discriminatory acts. (Opp'n at 7–8.) Specifically, plaintiffs suggest there was some ulterior, discriminatory motive behind Dwyer's decision to begin keeping a daily log of events related to Alex. (*Id.*) Additionally, plaintiffs take issue with the District's failure to inform Alex's parents of Dwyer's negative feelings toward him. (*Id.* at 8.) Plaintiffs argue that a full-inclusion, regular education program only works where the teacher is open to having the student in the class, such that the District's failure to inform plaintiffs of Dwyer's feelings toward Alex ensured the failure of the program. (*Id.*)

This argument is equally unconvincing. Even if these actions violate the IDEA, there is no evidence that they were done with bad faith or rise to the level of gross misjudgment or deliberate indifference. The evidence shows that Dwyer began keeping a daily log about Alex because she was worried and scared about having him in her classroom. This does not suggest bad faith or gross misjudgment, but rather a legitimate fear for her safety. Likewise, the District's failure to inform plaintiffs about Dwyer's concerns about Alex constitutes, at most, professional misjudgment. There is no showing of inappropriate or hostile behavior by Dwyer toward Alex. Nor should a school district be required to

---

5. Plaintiffs also make a conclusory allegation that the District had an inappropriate BIP in place in October 2002. (Opp'n at 7.) However, plaintiffs present no evidence in support of this allegation. Moreover, the January 2003 settlement agreement bars plaintiffs from challenging the appropriateness of the BIP. The requirements for a BIP are discussed and set forth under the IDEA and corresponding state law, and plaintiffs waived all claims under the IDEA as part of the settlement agreement.

6. Plaintiffs make a conclusory allegation that the restraints were improperly applied, but they provide no evidence to support this assertion.

inform parents every time a teacher has legitimate concerns about a disruptive child. Plaintiffs' suggestion that the District deliberately placed Alex with a teacher who was scared of him in order to sabotage Alex's education is not supported by any evidence.

■ Third, plaintiffs argue that defendants discriminated against Alex, and intentionally attempted to force him out of Valley Oak, by refusing to implement the Bridges' behavioral program. (*Id.* at 8.) Defendants allegedly failed to implement the program in two key ways: (1) by Dwyer's *refusal to implement Bridges'* whole-class reinforcement system; and (2) by school officials' repeated failure to follow Bridges' advice to ignore Alex's maladaptive behaviors, specifically with regard to the fire-alarm incidents. (*Id.*) The Hearing Office analyzed and rejected both of these arguments. (Wedner Decl. Ex. A. at 8–11.)

These actions, like the others, are insufficient to establish bad faith or gross misjudgment on the part of defendants. To the contrary, the evidence shows the District making a good faith effort to implement the Bridges' program. For instance, the District had several teachers, including Dwyer, attend a special training session on Bridges' behavior philosophy. Likewise, following the March 19th IEP meeting in which Bridges first suggested the creation of a whole-class reinforcement system, Dwyer took immediate steps to create such a program in her classroom. Although plaintiffs contend that Dwyer's program was not a whole-class reinforcement program as described by Bridges, the differences between the Bridges' pro-

posal and her plan were not great. In any event, plaintiffs concede that Dwyer was never told that she was required to implement the exact program suggested by Bridges. (Defs.' SUF ¶ 46.)

Similarly, while some school officials may have reprimanded Alex for pulling the fire alarms, there is no evidence that these actions were done in bad faith or constitute gross misjudgment. In fact, plaintiffs' own evidence shows that the District made efforts to prevent the school staff from continuing to reprimand Alex for such behavior. Specifically, the District's former special education coordinator went to Valley Oak on at least one occasion to remind the teachers not to reprimand Alex. (Varma Decl. Ex. 4.) In short, rather than suggesting bad faith or gross misjudgment, defendants' implementation of Bridges' program reflects a good faith effort to carry out the program while still protecting other students and staff.

■ Finally, plaintiffs contend that defendants' discriminatory plan culminated with the District's decision to unilaterally change Alex's educational placement through a TRO, without first exploring less aggressive options or contacting his parents. (Opp'n at 9.) Plaintiffs assert that defendants' bad faith and discriminatory intent in taking such actions is evidenced by three facts: (1) the filing of the TRO request without first responding to the letter Alex's parents sent one week prior to the filing; (2) the use of negative and hyperbolic language to describe Alex in the various declarations submitted by school officials in support of the TRO;[7] and (3) the judge's later decision at the preliminary injunction hearing to vacate

---

7. Alex complains about the use of descriptive terms in the declarations, such as "unpredictably violent," "methodical [in planning violence]," "intimidating," "threatening," "ticking time bomb," "menacing," "physically abusive," "psychotic," "going ballistic," "toughest year of teaching in thirteen years" to describe him and the circumstances. (Opp'n at 10.)

the portions of the TRO regarding the educational placement of Alex. (*Id.* at 9–10.)

This argument fails for many of the same reasons described above. For one, the District's decision to change Alex's educational placement through a TRO request does not necessarily violate the IDEA. The Supreme Court held in *Honig v. Doe,* 484 U.S. 305, 324–28, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) that although school officials do not have unilateral authority to exclude a disabled student based on violent and dangerous behavior, they can, in certain circumstances, seek judicial relief to change the educational placement of a dangerous child. Courts since *Honig* have repeatedly held that they can order the removal of dangerous children where the district shows that maintaining the child in the current placement is substantially likely to result in injury to himself or others and that the District has done all that it reasonably can to reduce the risk that the child will cause that injury. *See, e.g., Light v. Parkway C–2 Sch. Dist.,* 41 F.3d 1223, 1228 (8th Cir.1994) (articulating this standard); *Office of Special Education Programs Memorandum,* 97–7, 26 IDELR 981, at *4 (Aug. 9, 1997) (affirming that IDEA continues to allow districts to seek removal of children through court process in appropriate circumstances); *Henry v. Sch. Admin. Unit No. 29, Keen School Dist.,* 70 F.Supp.2d 52, 58 (D.N.H.1999) (same).

Even if the District did violate the IDEA by seeking a TRO without first exhausting the IDEA's administrative procedures, there is no evidence that the District's actions constitute bad faith or gross misjudgment. Rather, the evidence suggests that the District was acting reasonably and in good faith to resolve a difficult situation posed by a disruptive and violent student. Given the case law described above, its decision to pursue a TRO, on the advice of legal counsel, cannot be the basis for a finding of discrimination. Although the District did not first contact Alex's parents, their failure to do so neither violates the IDEA nor establishes bad faith or gross misjudgment. Finally, the Yolo County Superior Court's ruling does not change this conclusion, as the court simply referred the issue of Alex's placement to the District's Hearing Office. The court in no way suggested that it was bad faith or gross misjudgment for the District to have sought a TRO.

Likewise, the descriptions of Alex included in the various declarations do not provide evidence of bad faith or gross misjudgment. Although plaintiffs may disagree with the school officials' description of Alex, they have presented no evidence establishing that the statements were false or that school officials did not honestly believe these statements to be true. For the above reasons, plaintiffs' arguments regarding the TRO lack merit.

In sum, whether taken individually or as a whole, plaintiffs' allegations do not establish that defendants' actions amount to bad faith, gross misjudgment, or deliberate indifference. No reasonable factfinder could so find. Accordingly, the court GRANTS defendants' motion for summary judgment on this claim.

## B. § 504 Retaliation Claim

For similar reasons, plaintiffs fail to establish a § 504 retaliation claim. Because plaintiffs present no direct evidence of retaliation on the part of defendants, the court analyzes their claim under the *McDonnell–Douglas* burden-shifting test used to evaluate Title VII retaliation

claims.[8] *See Peebles v. Potter*, 354 F.3d 761, 770 (8th Cir.2004) (holding that the *McDonnell–Douglas* burden-shifting test is used to analyze § 504 retaliation claims where no direct evidence of retaliation exists). To establish a prima facie claim of retaliation under § 504, plaintiffs must show that: (1) they engaged in a protected activity; (2) the defendants knew they were involved in the protected activity; (3) an adverse action was taken against them; and (4) a causal connection exists between the protected activity and the adverse action. *See, e.g., Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir.2002); *Hunt v. St. Peter Sch.*, 963 F.Supp. 843, 854 (W.D.Mo. 1997).

■■■ If the plaintiffs establish a prima facie case, the burden shifts to defendants to show a legitimate, non-retaliatory purpose for their acts. *Hunt*, 963 F.Supp. at 854; *Johnson v. Sullivan*, 945 F.2d 976, 980–81 (7th Cir.1991). Upon this showing, the burden shifts back to the plaintiffs to demonstrate that the proffered reason was pretextual. *Johnson*, 945 F.2d at 980–81. To overcome defendants' legitimate, non-discriminatory reason, plaintiffs must "show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the [school district] or indirectly by showing that the [school district's] proffered explanation is unworthy of credence.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). If the plaintiffs are relying solely on indirect or circumstantial evidence of pretext, then the evidence must be "specific" and "substantial" to survive summary judgment. *Id.* (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)).

Here, plaintiffs have arguably established a prima facie case of retaliation. (Opp'n at 11.) First, plaintiffs have identified several protected activities engaged in by Alex's parents, namely: (1) withdrawing their consent to the use of physical restraints in June 2002; (2) filing a request for a due process hearing in December 2002; (3) refusing to agree to the District's IEP proposal in March 2003; and (4) writing a letter to the District on April 11, 2003 complaining about the implementation of the settlement agreement. (*Id.*) Second, plaintiffs assert that the District and its staff were aware of all the above protected activities. (*Id.*)

Third, plaintiffs identify several allegedly retaliatory, adverse actions taken by defendants, many of which the court has already discussed, including: (1) failing to develop an appropriate behavior plan; (2) using physical restraints when the inappropriate behavior plan failed; (3) not revealing that Dwyer was suffering emotional distress and was afraid of Alex; (4) refusing to abide by the behavior recommendations of Bridges; (5) sabotaging Bridges' behavior techniques regarding the fire alarm; (6) requesting a TRO to unilaterally change Alex's educational placement; and (7) embellishing descriptions of him as a dangerous individual to support its TRO request. (*Id.* at 11–12.) Even though many of these allegations are weak, as described above, they are sufficient to meet plaintiffs' low prima facie burden.[9]

---

**8.** Plaintiffs do allege that Clumpner, the District's former special education coordinator, commented at an IEP meeting in December 2002 that filing for due process is "a very difficult process," and that if plaintiffs chose to file for due process, "relationship [between the parties] would never be the same." (Wedner Decl. Ex. W at 247.) This sole, ambiguous statement is insufficient to constitute direct evidence of retaliation.

**9.** Defendants argue that some of the identified actions are not "adverse" because they do not

Finally, Alex has established a sufficient causal connection to satisfy the prima facie test. Courts have generally held that causation can be inferred from timing alone where the adverse action follows closely on the heels of the protected activity. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (stating that the temporal proximity must be "very close"). Here, Alex's parents engaged in several protected activities between June 2002 and April 2003. Although some of the alleged adverse actions did not occur immediately after these actions, several others did. For instance, the District's request for a TRO occurred a month or less after Alex's parents rejected the District's IEP proposal in March 2003. Courts have found a one-month period sufficiently close to create an inference of a causal connection.[10] *Calero–Cerezo v. DOJ,* 355 F.3d 6, 25–26 (1st Cir.2004). Furthermore, when looked at as a whole, plaintiffs are alleging a pattern of escalating retaliatory actions in response to various protected activities taken by Alex's parents. The interrelated nature of the protected activities and the alleged adverse actions is probably sufficient to establish the causal connection element of the prima facie case.

Even if plaintiffs have established a prima facie case, however, they fail to present any evidence rebutting or overcoming defendants' legitimate, nondiscriminatory reason. Defendants contend that their actions, rather than being retaliatory, were motivated by a desire to protect Alex, the other students, and the staff from Alex's dangerous behavior, and to provide Alex with a FAPE. (Mot. at 26.) Far from rebutting this proffered reason, the parties' evidence supports defendants' position. As described more fully above, the evidence shows defendants struggling to handle an undisputedly difficult child and making good faith efforts to meet Alex's needs while also protecting Alex, the other students, and the school staff from Alex's disruptive behavior. In short, plaintiffs' evidence falls far short of the "specific" and "substantial" evidence of pretext necessary to overcome defendants' legitimate, nondiscriminatory reason. Accordingly, the court GRANTS defendants' motion for summary judgment on this claim.

### III.

For the forgoing reasons, the court GRANTS defendants' motion to dismiss plaintiffs' retaliation and discrimination claims brought under § 504 of the Rehabilitation Act as against all defendants.

IT IS SO ORDERED.

constitute a violation of the IDEA. (Mot. at 26.) However, this still remains an open question because defendants have not moved for summary judgment on Alex's IDEA claim.

10. Defendants argue that there is no causal connection between their TRO application and the April 11, 2003 letter because they started the process of seeking a TRO before April 11. (Mot. at 25.) However, the refusal of Alex's parents to agree to an IEP plan in mid-March 2003 was also a protected activity and, as noted above, the District began to consider a TRO application less than a month thereafter. Therefore, a causal connection can be inferred from the timing of the District's actions.